THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL WEAD, Defendant-Appellant.

First District (5th Division)   No. 1—02—1878

Opinion filed December 23, 2005.

Edwin A. Burnette, Public Defender, of Chicago (R.H.R. Silvertrust, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Heather Weiss, and Martha-Victoria Diaz, of counsel), for the People.

JUSTICE NEVILLE delivered the modified opinion of the court:

After a jury trial, Daniel Wead was found guilty of first degree murder and sentenced to 38 years in the Illinois Department of Corrections. Wead's motion for a new trial was denied. Wead now appeals and presents the following issues for our review: (1) whether the police had probable cause to arrest Wead on January 16, 1999, when the police did not have a warrant for his arrest and did not observe him commit a crime prior to his arrest; and (2) whether Wead's January 18, 1999, statement was voluntary when, prior to making the statement, he was isolated in an interview room at a police station for 54 hours.

Originally, we reversed Wead's conviction and remanded for a new trial, instructing the trial court to suppress the defendant's postarrest statement. However, we were directed by the Illinois Supreme Court in a supervisory order to vacate the judgment and reconsider our decision in light of *People v. Willis*, 215 Ill. 2d 517 (2005), and we have complied with the order in this modified opinion.

## BACKGROUND

### The Hearing on the Motion to Quash Arrest and Suppress Evidence

#### *Officer Bill Quinn*

Officer Bill Quinn of the Chicago police department was detailed to the Area One Mission Team at 51st Street and Wentworth Avenue. Officer Quinn testified that on January 16, 1999, the detectives on the team asked him to find Daniel Wead and bring him to the police station. Officer Quinn testified that he and his partner were dressed in civilian clothing and riding in an unmarked police car. They drove to the area Wead was known to frequent and observed Wead on the sidewalk in front of 2306 West 51st Street. Officer Quinn stated that it looked like Wead was exiting a building. Officer Quinn testified that

he did not have a search warrant to search Wead or the premises, and he did not see Wead commit a crime prior to approaching him. According to Officer Quinn, after a conversation with Wead, Wead got into the backseat of the unmarked police car and rode to Area One. Officer Quinn testified that he took Wead to the Area One detectives division and put him in an interview room and left the door open. Finally, Officer Quinn testified that he had not been apprised of the facts of the case before he was directed to pick up Wead and he had no involvement with Wead after bringing him to the interview room.

On cross-examination, Officer Quinn testified that before he was sent to pick up Wead, he was at the Bruno Kopec homicide scene and Terry Lasa came forward and spoke with the detectives. Officer Quinn stated that he spoke with Lasa in the car after the detectives directed him to take Lasa back to Area One. After speaking with Lasa, the detectives asked Officer Quinn about the name "Billy Reid" and gave him the description Lasa gave them. Officer Quinn testified that he told the detectives that Wead fit the description of the person they were looking for, so he retrieved a photograph of Wead and gave it to the detectives. Officer Quinn stated that he believed the detectives showed Wead's photograph to Lasa.

Officer Quinn testified that he first saw Wead around 1:30 p.m., and he told Wead that the Area One detectives were investigating a homicide and interviewing people. Officer Quinn testified that he asked Wead to accompany him to the station and Wead agreed. Officer Quinn testified that Wead would not have been taken to the police station if he had stated that he did not want to go with the police. Officer Quinn patted Wead down before he got into the backseat of the car. Officer Quinn stated that he took a small folding knife clipped to Wead's belt because no weapons were allowed in the backseat of the police car. Officer Quinn told Wead that the knife would be returned. Finally, Officer Quinn testified that he did not handcuff Wead at the station. On redirect examination, Officer Quinn testified that he never gave the knife back to Wead, but gave Wead's knife to a detective at Area One.

### Detective Timothy Nolan

Detective Timothy Nolan testified that he never told Wead that he wanted him to be a witness for "Bob Reid." When he spoke to Wead on January 16, 1999, Nolan stated that he told Wead they were investigating Kopec's murder. Detective Nolan also testified that Wead stated that he knew that Kopec had been murdered. According to Detective Nolan, when he asked Wead if he could inventory his knife, Wead stated that he was using drugs on January 15, 1999, the date

Kopec was killed, and raised his sleeves to show Detective Nolan the track marks. Detective Nolan testified that he had not seen Wead's arm prior to January 18, 1999, because Wead had on a long-sleeved sweatshirt. Detective Nolan stated that Wead blurted out that he should take Lasa for a polygraph examination. Detective Nolan testified that when he told Wead that Lasa had already volunteered for a polygraph examination, Wead stated, "okay officer, I did it." Detective Nolan testified that at no time prior to Wead's confession had any officer accused Wead of killing Kopec or demanded that he admit that he killed Kopec. Detective Nolan also testified that Wead was never handcuffed when they were together and was never forced to wear a paper outfit.

On cross-examination, Detective Nolan testified that when he questioned Lasa about his knowledge of disagreements Bruno Kopec had with people before his death, Lasa stated that Kopec told him that he was upset with an individual named Billy Reid or Tim Reid for taking $10 and not returning it. Detective Nolan testified that on January 16, 1999, and January 17, 1999, he did not offer Wead a ride home or ask him if he wanted to be taken home. Detective Nolan stated that when Wead told him that he wanted to help the investigation, he informed Wead that to help he would have to stay at the station while other witnesses were interviewed. Detective Nolan testified that Wead confessed around five minutes after he walked into the interview room on January 18, 1999. Detective Nolan stated that he did not speak to Wead prior to Wead's confession. However, after further cross-examination on the matter, Detective Nolan testified that he did walk into the room and speak to Wead before he confessed. Detective Nolan testified that Wead's confession was not the first statement made by Wead when he entered the interview room.

### Daniel Wead

Wead testified that on January 16, 1999, he was leaving to go buy some coffee when Officer Quinn approached him and stated that he wanted him to be a witness for a man named Bob Reid. Wead asked Officer Quinn "what he was going to be a witness of" and Officer Quinn said he did not know but that Wead would have to go to the station. Wead testified that Officer Quinn took his knife and keys before he got in the police car. Wead also testified that he only agreed to go to the police station because of what Officer Quinn had told him. He later testified that "they [the police officers] told me one thing and done something else."

Wead testified that Officer Quinn and his partner put him in a room and closed the door. He stated that, at this point, he did not feel

that he could leave the interview room and go home. Wead testified that he was handcuffed by his right hand on the left side of the wall as soon as he walked into the interview room. Wead testified that the police did not speak to him regarding a murder investigation until the third day he was at Area One. Wead stated that he was up for three days and nights in the interview room sitting on the bench. He testified that he was only unhandcuffed on the two occasions he was taken to the bathroom and that he was fed only on January 16, 1999.

Wead testified that the detectives told him that a man named Bob Reid told them that he knew the victim. Wead responded that he did know the victim. Wead testified that he was never told that the victim had been murdered. He was asked the last time he saw the victim and responded Thursday morning. According to Wead, when he was questioned on January 16, 1999, he did not know the victim was dead and the police never told him that the victim was dead, only that he, Wead, was going to be a witness. Wead testified that he did not ask for a lawyer until he found out on January 18, 1999, that the victim had been murdered.

Wead testified that his apartment was searched without his consent because he did not sign a consent to search form. Initially, Wead stated that the signature on the consent to search form was his, but he later said that he did not remember signing the form and that he did not recognize the signature. Wead stated that he was unable to read or write. Wead testified that Detective Nolan was not the first detective to speak with him. Wead stated that he did not tell the officers that he wanted to go home because it would have done no good, since the door was locked and he was handcuffed. Finally, Wead testified that he was not homeless and that he planned to live at the place he was currently rehabbing until someone moved in.

Before the State was permitted to cross-examine Wead, the trial judge asked Wead some questions. Wead testified that on January 16 and 17, 1999, he thought he was a witness. Wead testified that on January 18, 1999, when the detectives told him how the victim was killed and how he had done it, he knew that he was not a witness but a suspect. Wead testified that he never told the detectives that he had a drug problem. After the trial judge asked his questions, the State was permitted to cross-examine Wead.

On cross-examination, Wead testified that on January 16 and 17, 1999, he thought he was a witness because he was told he was a witness. Therefore, he agreed to be there as a witness. He further stated that he was put in a paper uniform on January 16, 1999. Finally, Wead testified that on January 18, 1999, Detective Nolan never asked whether he could inventory Wead's knife to do some tests.

### Detective John Henry

Detective John Henry was called by the State in rebuttal and testified that the consent to search form was read and explained to Wead, including the fact that he had the right to refuse to sign it. Detective Henry further testified that Wead stated that he wished to cooperate with the detectives and signed the consent to search form for his apartment. Finally, Detective Henry testified that he provided Wead with cigarettes and food and permitted him to use the washroom during his stay in the interview room.

On cross-examination, Detective Henry testified that Wead indicated that he could not read, so Detective Henry read the consent to search form to him. Detective Henry stated that he explained to Wead that they would look through his apartment for (1) a matchbook with telephone numbers and the names of the two individuals that could verify Wead's alibi, and (2) for bloody clothing. Detective Henry testified that the police were looking for physical evidence because the murder was committed by a knife or sharp object, but the police were not looking for a knife.

Detective Henry testified that on January 16 and 17, 1999, he never took Wead to the lockup. Detective Henry stated that he escorted Wead to and from the bathroom because there were inconsistencies in Wead's comments that were being investigated; because it was not known at that time whether Wead was an offender; and because the detectives did not want Wead to walk out. On redirect examination, Detective Henry stated that he escorted Wead to and from the bathroom because it was police procedure for each detective to escort his suspects or witnesses to and from the bathroom when they are at Area One. On re-cross-examination, Detective Henry testified that he did not know if the procedure of escorting witnesses to and from the bathroom is written down and that it is just a procedure used for safekeeping individuals.

### Detective Timothy Nolan

Detective Nolan was called by the State in surrebutal and he testified that on January 17, 1999, he learned that Detectives Henry and Holmes had searched for bloody clothes and physical evidence.

## The Hearing on the Motion to Suppress Statements

### Detective Timothy Nolan

Detective Nolan testified that he first met Wead on January 16, 1999, at approximately 2:30 p.m., in an Area One detective division interview room. Detective Nolan stated that he had no knowledge of whether anyone spoke with Wead before he and his partner entered the interview room. Detective Nolan started the interview by "Miran-

dizing" Wead. According to Detective Nolan, Wead stated that he understood his *Miranda* rights. The interview lasted 15 to 20 minutes. When his shift ended, Detective Nolan turned the case over to the third-shift detectives.

Detective Nolan testified that on January 17, 1999, he entered the interview room alone and "Mirandized" Wead before beginning any discussions. The interview lasted "almost a whole day," beginning at approximately 8:30 a.m. and lasting until approximately 3 p.m. No one other than Detective Nolan interviewed Wead on January 17, 1999.

On January 18, 1999, Detective Nolan entered the interview room alone at approximately 2:30 p.m. and asked Wead if he could inventory the knife in Wead's coat pocket. Detective Nolan stated that Wead became agitated and started yelling because he wanted Detective Nolan to take Lasa in for a polygraph examination. Detective Nolan further testified that Wead then stated that he was a drug user, at which point Detective Nolan advised Wead of his *Miranda* rights and proceeded to question him.

Detective Nolan testified that Assistant State's Attorney Adam Monreal and a court reporter were called to the Area One interview room to take a statement from Wead. Before taking the statement, Monreal "Mirandized" Wead. According to Detective Nolan, Wead never questioned whether he needed a lawyer during their earlier conversations. However, Detective Nolan read from Wead's statement that Wead did ask Monreal "if it would be good if he got a lawyer." In the statement, Monreal replied "you have a right. You have not asked for a lawyer up until now, correct?" Detective Nolan continued reading from the statement and testified that Wead then asked, "[W]ould it be good to have a lawyer?" Monreal replied to Wead's question, "[Y]ou have not asked at any time, right?" Detective Nolan continued reading from the statement and testified that Wead said "he was just thinking about [having a lawyer] and wondering if he should—." Detective Nolan testified that Monreal then asked Wead if he wished to have a lawyer present and Wead replied, "I don't know. Just go ahead." Detective Nolan testified that Monreal again asked Wead if he wished to have a lawyer present and Wead replied, "No." Detective Nolan testified that Wead provided Monreal with a 12-page statement at approximately 8:17 p.m.

Detective Nolan stated that in his presence no one physically coerced or struck Wead, made threats or promises to Wead, or made misrepresentations to Wead in an effort to get him to speak. He never saw any signs of physical abuse on Wead's body. Additionally, Detective Nolan testified that Wead stated he was treated "decent" by the detectives.

On cross-examination, Detective Nolan testified that on January 16, 1999, when he met Wead for the first time in the interview room, Wead was not free to leave. Detective Nolan testified that he was not with Wead at all times on January 16 and 17, 1999. Detective Nolan stated that on January 17, 1999, Wead was moved into a different interview room and was not in the same interview room he left him in on January 16, 1999. Detective Nolan testified that on January 17, 1999, he walked out of the interview room when Wead said he was not going to speak anymore. On redirect examination, Detective Nolan testified that Wead never asked to leave the police station and was not denied access to leave. He stated that Wead was given food and allowed to use the bathroom. Finally, on re-cross-examination, Detective Nolan testified that on January 18, 1999, Wead did not come to him and say that he wanted to talk about the murder.

Before Detective Nolan was permitted to exit the witness stand, the trial judge asked Detective Nolan some questions. Detective Nolan testified that he wanted to inventory the knife because he knew the victim had been stabbed and the murder weapon had not been found. Detective Nolan testified that the knife had no visible stains that looked like blood.

### Detective John Henry

Detective Henry testified that on January 16, 1999, he and his partner were working the third watch from 4:30 p.m. to 1 a.m. They took over the Kopec murder investigation from Detective Nolan when the second watch ended. Detective Henry testified that he "Mirandized" Wead at 8:30 p.m. and that he and his partner spoke with him for approximately 90 minutes. Detective Henry spoke with Wead on and off throughout the evening. His partner was never alone with Wead. On cross-examination, Detective Henry testified that he was not with Wead at all times during the investigation.

### The Trial Court's Findings

The trial court considered the pretrial record in making its finding on Wead's pretrial motions. After hearing arguments on the motions to quash arrest and suppress evidence and the motion to suppress statements, the trial judge denied the motions to quash arrest and suppress evidence, finding that: (1) Wead willingly and voluntarily accompanied the police to the police station, believing himself to be a witness as opposed to a suspect, on January 16, 17, and 18 of 1999; (2) probable cause existed to arrest Wead on the afternoon of January 17, 1999, based on Lasa's information of the theft incident and inconsistencies in Wead's statements to the police, when he indicated to Detective Nolan that he no longer wished to talk; (3) Wead was not in

custody until January 18, 1999, at the time of his inculpatory statement; and (4) other than the time spent in the Area One interview room, no indicia of arrest were present and the stay was voluntarily initiated. The trial judge also denied the motion to suppress the statement, finding that: (1) the police scrupulously honored Wead's right to remain silent on January 17, 1999, when the questioning of Wead was immediately stopped, the police did not speak to Wead substantively for nearly 24 hours, and *Miranda* warnings were given before the police resumed questioning; and (2) the request to inventory Wead's knife was not subterfuge to induce Wead to further talk on January 18, 1999, but was a reasonable administrative request.

Wead maintains in his brief that the trial court erred when it denied the motion to quash arrest and suppress evidence and the motion to suppress his statement. Wead did not raise any issues in his brief regarding the trial.

## ANALYSIS

On appeal, Wead argues that the trial court erred when it denied his motion to quash his arrest and suppress the evidence. In light of the trial court's ruling, we must decide whether the police had probable cause to arrest Wead when the police officers stopped Wead when he was exiting a building and asked Wead to accompany them to the police station to assist with a homicide investigation. Wead argues that his detention by the police officers constituted an arrest or seizure under the fourth amendment and his subsequent confession was the product of that illegal arrest. Wead contends that the police did not have probable cause to arrest him on January 16, 1999, when he was stopped on the street by the police, transported to the police station, and placed in an interview room for questioning. The State maintains that Wead was not illegally arrested because he voluntarily accompanied the police officers to the police station. Further, the State maintains that Wead voluntarily stayed at the police station and spent two nights in an interrogation room. We note that the trial court found (1) that Wead was not in custody when he stayed at the police station in an interview room lacking sleeping facilities because he was homeless; (2) that the police had probable cause to arrest Wead on January 17, 1999; and (3) that Wead was not arrested until January 18, 1999.

■ We begin our analysis by identifying the relevant standard of review. In *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996), the United States Supreme Court held that reviewing courts should review *de novo* the ultimate finding with respect to probable cause or reasonable suspicion. *Ornelas*, 517 U.S. at

699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663; *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). The court cautioned, however, that findings of historical fact should be reviewed only for clear error and that reviewing courts must give due weight to inferences drawn from the facts by the fact finder. *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663; *Sorenson*, 196 Ill. 2d at 431.

### Wead's Initial Contact With the Police on the Street

■ The first question we must answer is whether an arrest occurred on January 16, 1999, when Wead walked out of a building, had a discussion with Officer Quinn, and then got into a police car and accompanied Officer Quinn and his partner to the police station. We note '' 'that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.' '' *Dunaway v. New York*, 442 U.S. 200, 207 n.6, 60 L. Ed. 2d 824, 832 n.6, 99 S. Ct. 2248, 2253 n.6 (1979), quoting *Terry v. Ohio*, 392 U.S. 1, 16, 20 L. Ed. 2d 889, 903, 88 S. Ct. 1868, 1877 (1968); *People v. McKinney*, 277 Ill. App. 3d 889, 893 (1996). In the Code of Criminal Procedure of 1963, an arrest is defined as the taking of a person into custody and is accomplished by an actual restraint of that person or by his submission to custody. See 725 ILCS 5/102—5 (West 2002); *People v. Herron*, 89 Ill. App. 3d 1048, 1051 (1980). The test for determining whether a suspect has been arrested is whether, in light of all of the facts and circumstances of the particular case, a reasonable person would have believed that at the time in question he was no longer free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 572, 108 S. Ct. 1975, 1979 (1988); *People v. Williams*, 164 Ill. 2d 1, 11-12 (1994); *People v. Melock*, 149 Ill. 2d 423, 437 (1992); *People v. Holveck*, 141 Ill. 2d 84, 95 (1990). Among the circumstances a court may consider in determining whether a person has been seized for fourth amendment purposes are the presence of multiple police officers, the display of weapons by an officer, the touching of the person by the officers, the officers' use of language suggesting that the person is compelled to obey, and the occurrence of practices that normally accompany an arrest, such as searching, booking, handcuffing, photographing, and fingerprinting. *United States v. Mendenhall*, 446 U.S. 544, 554-55, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980); see also *People v. Murray*, 137 Ill. 2d 382, 391 (1990); *People v. Wicks*, 236 Ill. App. 3d 97, 104 (1992).

In this case, the evidence establishes that Officer Quinn and his partner were dressed in civilian clothes and riding in an unmarked police car when they approached Wead on the street. Officer Quinn told Wead that the Area One detectives were investigating a homicide

and asked him to accompany them to the police station. Wead agreed to accompany Officer Quinn and his partner to the police station. The evidence establishes that when Wead encountered the police on the street and was transported to the police station, the officers did not display their weapons and there was no formal declaration of arrest or a show of police authority which compelled him to go to the police station. In addition, Wead was not handcuffed or given a *Miranda* warning prior to being placed in the police car, although he was searched and his pocket knife was removed from his belt. See *People v. Bolden*, 197 Ill. 2d 166, 180 (2001). More importantly, Officer Quinn testified that had Wead refused to accompany him back to the police station or stated at any time that he no longer wished to help the police, he would have been free to leave. See *McKinney*, 277 Ill. App. 3d at 893, quoting *People v. Young*, 206 Ill. App. 3d 789, 800 (1990) ("[W]e will consider as true only the testimony of the police officers, except where defendant's testimony was unrebutted, so as not to substitute our judgment for that of the trial court on issues of credibility"). The evidence establishes that once the officers arrived at the police station, Officer Quinn placed Wead in an interview room and informed the detectives handling the Kopec murder investigation that Wead was at the police station.

The circumstances which might suggest that Wead was under arrest are not present in this case: (1) only two officers were present for Wead's trip to the station; (2) the officers did not display their weapons; (3) the officers did not use language suggesting that Wead was required to go to the police station; and (4) while Wead was searched and his pocket knife was confiscated on the street, once at the police station, he was not fingerprinted or photographed. Therefore, considering all the facts and circumstances at the time of Wead's initial encounter with Officer Quinn on the street, we find that an arrest or seizure did not occur because (1) Wead agreed to accompany Officer Quinn and his partner to the police station; (2) Wead was not compelled to go to the police station with a display of weapons or handcuffs or with the use of language; and (3) Wead would not have been deprived of his freedom and forced to go to the police station, according to Quinn, had he stated that he did not want to assist with the investigation.

### Wead's Detention at the Police Station

The next question we must address is whether Wead was arrested when he was detained at the police station. The answer to this question is yes. *Dunaway*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Young*, 206 Ill. App. 3d 789. In *Dunaway*, the police received informa-

tion from an informant that the defendant was involved in the crime. *Dunaway*, 442 U.S. at 203, 60 L. Ed. 2d at 829, 99 S. Ct. at 2251. The police questioned the informant but did not receive " 'enough information to get a warrant.' " *Dunaway*, 442 U.S. at 203, 60 L. Ed. 2d at 829, 99 S. Ct. at 2251. A police detective ordered other detectives to " 'pick up' " the defendant and bring him in. *Dunaway*, 442 U.S. at 203, 60 L. Ed. 2d at 829, 99 S. Ct. at 2251. The defendant "was taken into custody; although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave." *Dunaway*, 442 U.S. at 203, 60 L. Ed. 2d at 830, 99 S. Ct. at 2252. He was driven to police headquarters in a police car and placed in an interrogation room, where he was questioned by officers after being given the warning required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Defendant waived counsel and eventually made a statement that incriminated him in the crime. The Supreme Court held in *Dunaway* that the defendant was arrested when the police involuntarily took defendant to the police station for questioning in violation of his rights under the fourth amendment. *Dunaway*, 442 U.S. at 207, 60 L. Ed. 2d at 832, 99 S. Ct. at 2253-54. The *Dunaway* Court noted that fourth amendment protections apply during investigatory seizures. *Dunaway*, 442 U.S. at 214-15, 60 L. Ed. 2d at 837, 99 S. Ct. at 2257-58.

The facts in this case are similar to the facts in *Dunaway*: (1) the police received information about Wead and his connection to the crime from Lasa; (2) the police did not receive enough information from Lasa to obtain a warrant; (3) detectives ordered Officer Quinn to pick Wead up and bring him to the station; (4) Wead was not told that he was under arrest during his initial encounter with the police on the street; (5) when Wead agreed to go with the police, he was driven to the police station and placed in an interrogation room; (6) once Wead arrived at the station, Detective Nolan stated that Wead was not free to leave the station and, therefore, Wead would have been physically restrained if he had attempted to leave; (7) Wead was given his *Miranda* warning and questioned numerous times by the officers; and (8) Wead made a statement after being in police custody for 54 hours. In this case Wead's voluntary act of going to the police station became an involuntary act once he arrived at the station and was not free to leave the police station. The *Dunaway* Court would find that Wead was under arrest when he was not free to leave the police station. See *Dunaway*, 442 U.S. at 214-15, 60 L. Ed. 2d at 837, 99 S. Ct. at 2257-58.

▮ In *Young*, this court considered the following facts to determine if an illegal arrest had taken place: (1) whether the defendant was

asked to wait in the public waiting room at the police station; (2) whether the defendant was put in an interrogation room with the door closed; (3) whether the defendant was released or told he was free to leave after he was questioned by a police officer, even though he had not implicated himself; (4) whether the defendant spent the night in a room with no sleeping facilities; (5) whether the defendant was denied telephone calls; (6) whether the defendant was in the police station for an extended length of time before making a statement; and (7) whether the defendant was briefly questioned only once after the initial interview. *Young*, 206 Ill. App. 3d at 800-01. The *Young* court held that under such circumstances a reasonable person would conclude that he or she was not free to leave. *Young*, 206 Ill. App. 3d at 801. Applying *Young* to the facts in this case, we conclude that Wead was under arrest once he arrived at the police station because (1) Wead was not free to leave the police station and, therefore, his agreement and voluntary act of going to the police station were nullified once he was divested of his freedom when Detective Nolan decided he could not leave the station; (2) Wead was not asked to wait in the public waiting room; (3) Wead was questioned several times over numerous hours by different officers after his initial interview; (4) Wead was never told that he was free to leave the police station after he was questioned on January 16 and 17, 1999, and failed to make an inculpatory statement; (5) Wead spent three days in an interrogation room with no sleeping facilities (he was not allowed to bathe or brush his teeth and had to be escorted to the washroom); and (6) Wead was in the police station for 54 hours before making a statement. *Young*, 206 Ill. App. 3d at 800-01. Therefore, following *Dunaway* and *Young*, we hold that Wead was under arrest when he was no longer free to leave the police station.

## Probable Cause

■ Next, in light of our holding that Wead was arrested on January 16, 1999, once he arrived at the police station, we must now determine whether the police had probable cause to detain Wead. Our task on review is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332 (1983); *People v. Tisler*, 103 Ill. 2d 226, 248 (1984). The trial court, when making a probable cause determination, is to apply standards at least as stringent as those that guide a magistrate in deciding whether to issue a warrant. *People v. Williams*, 147 Ill. 2d 173, 209 (1991), citing *People v. Adams*, 131 Ill. 2d 387, 398 (1989), and *Tisler*, 103 Ill. 2d at 236. The trial court must determine whether " 'a reasonable and prudent

man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense.' " *Tisler*, 103 Ill. 2d at 237, quoting *People v. Wright*, 41 Ill. 2d 170, 174 (1968). Whether the necessary probable cause exists is governed, not by technical legal rules, but rather by commonsense considerations that are factual and practical. *People v. Mitchell*, 45 Ill. 2d 148, 153-54 (1970). This review cannot be tainted by hindsight, which may luckily seem to be supported by the fruit of some criminality; rather, the review must center on the information available to the officers preceding the arrest. *Adams*, 131 Ill. 2d at 398. It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion (see *Henry v. United States*, 361 U.S. 98, 101, 4 L. Ed. 2d 134, 138, 80 S. Ct. 168, 170 (1959); *Mallory v. United States*, 354 U.S. 449, 454, 1 L. Ed. 2d 1479, 1483, 77 S. Ct. 1356, 1359 (1957)), though the arresting officer need not have in hand evidence that would suffice to convict. *Wong Sun v. United States*, 371 U.S. 471, 479, 9 L. Ed. 2d 441, 450, 83 S. Ct. 407, 413 (1963); *People v. Marino*, 44 Ill. 2d 562, 573 (1970).

■ A person is lawfully arrested when the police: (a) have a warrant commanding that such person be arrested; or (b) have reasonable grounds to believe that a warrant for the person's arrest has been issued in the State or in another jurisdiction; or (c) have reasonable grounds to believe that the person is committing or has committed an offense. *People v. Mathis*, 55 Ill. App. 3d 680, 685 (1977) ("In Illinois, an arrest without a warrant is not proper unless the conditions prescribed by statute are met"); 725 ILCS 5/107—2 (West 1992). The Illinois Supreme Court has held the reasonable grounds standard is synonymous with probable cause. *Holveck*, 141 Ill. 2d at 95, citing *People v. Wright*, 111 Ill. 2d 128, 145 (1985); see 725 ILCS 5/107—2(c) (West 2002). Absent probable cause or a warrant based thereon, an arrest is violative of the fourth amendment protections. *Melock*, 149 Ill. 2d at 436, citing *Dunaway*, 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.

The evidence establishes that Officer Quinn and his partner were assisting with the Kopec murder investigation but they did not have a warrant for Wead's arrest and did not have any evidence that Wead had committed a crime. In fact, Officer Quinn testified that he was not apprised of the facts of the case prior to being directed by the detectives to bring Wead to the police station. We found that probable cause was unnecessary when Officer Quinn encountered Wead on the street and brought him to the police station because Wead agreed to assist the police with an investigation and voluntarily accompanied the officers to the station. Therefore, prior to arriving at the station,

Wead's freedom to make a decision and to refuse to accompany the police to the station was unconstrained by interference from the police officers.

While Officer Quinn did not arrest Wead, Detective Nolan did because Wead was detained and deprived of his freedom once he arrived at the police station. Wead's voluntary act of agreeing to accompany the police to the station to assist in the investigation was nullified by Detective Nolan's decision that Wead could not leave the station, thereby depriving him of his freedom. The police need probable cause when they arrest or seize a citizen and deprive him of his freedom. 725 ILCS 5/107—2 (West 2002). The evidence establishes that Detective Nolan did not have a warrant for Wead's arrest and did not observe Wead commit a crime or have reasonable grounds to believe that he had committed a crime when he talked with Wead in the interview room for 54 hours as part of the Kopec murder investigation. 725 ILCS 5/107—2 (West 2002). If Detective Nolan had evidence of Wead's involvement in any crime, he would have charged him on January 16 or 17, 1999; instead, he detained Wead for 54 hours in the police station and charged him on January 18, 1999, after he made a statement.

■ We note that the trial court found that probable cause did not exist to arrest Wead on January 16, 1999, and the State conceded during oral argument that the police did not have sufficient evidence on January 16, 1999, or January 17, 1999, to obtain a warrant for Wead's arrest. We find that the State's concession is also an admission that the police did not have probable cause to arrest Wead until Wead made the statement on January 18, 1999. In light of the aforementioned facts and circumstances, we hold that probable cause did not exist to detain Wead because the facts and circumstances within Detective Nolan's knowledge, prior to Wead's statement in the interview room on January 18, 1999, were not sufficient to warrant a man of reasonable caution to believe that Wead had committed a crime or murdered Bruno Kopec. *Dunaway*, 442 U.S. at 214, 60 L. Ed. 2d at 837, 99 S. Ct. at 2257; 725 ILCS 5/107—2 (West 2002). Therefore, absent a warrant and reasonable grounds to believe Wead had committed a crime on January 16 and 17, 1999, Wead's 54-hour detention was illegal and violated the fourth amendment.

We also note, however, that the trial court found that the police had probable cause to arrest Wead on January 17, 1999, for two reasons: (1) because Lasa provided the police with information about Wead's involvement in a theft; and (2) because Wead made inconsistent statements to the police. We find that the trial court did not have a substantial legal basis for concluding that probable cause existed.

Wead's alleged involvement in a theft was obviously nothing more than a suspicion. See *Henry*, 361 U.S. at 101, 4 L. Ed. 2d at 138, 80 S. Ct. at 170 (rumors, reports, suspicion or strong reason to suspect are not adequate to support a warrant for arrest). The Criminal Code of 1961 provides that a theft occurs when a person obtains unauthorized control over property. 720 ILCS 5/16—1(a) (West 2002). Here, Lasa had no personal knowledge of the theft he discussed with the police. In addition, the person named by Lasa and suspected of the theft was Billy or Tim Reid. Lasa did not name Wead as the person who committed the theft; therefore, Lasa did not provide the police with information that Wead obtained unauthorized control over Kopec's property. Consequently, the police did not have probable cause to believe that Wead committed a crime because Lasa named Billy or Tim Reid as the person who committed the theft. Moreover, Wead's inconsistent statements to the police after his arrest do not provide probable cause for his arrest because an arrest is never justified by evidence discovered during an interrogation subsequent to an arrest. *Henry*, 361 U.S. at 103, 4 L. Ed. 2d at 139, 80 S. Ct. at 171.

## The Admissibility of Wead's Confession

█ Wead next argues that his confession is inadmissible because it is the product of his illegal detention and not the result of an independent act of his free will. The determination that an illegal arrest has occurred is not dispositive of the issue of the admissibility of Wead's subsequent confession. *People v. Reynolds*, 257 Ill. App. 3d 792, 805 (1994). Statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will. *Reynolds*, 257 Ill. App. 3d at 805, citing *Florida v. Royer*, 460 U.S. 491, 501, 75 L. Ed. 2d 229, 238, 103 S. Ct. 1319, 1326 (1983). Evidence obtained as a result of an illegal detention must be suppressed absent significant intervening circumstances that purged the taint of the illegal arrest. *Dunaway*, 442 U.S. at 219, 60 L. Ed. 2d at 840, 99 S. Ct. at 2260; see also *Taylor v. Alabama*, 457 U.S. 687, 692-93, 73 L. Ed. 2d 314, 321, 102 S. Ct. 2664, 2668 (1982) (Court held confession inadmissible as the fruit of an illegal arrest when defendant confessed after police arrested defendant without a warrant and used defendant's fingerprints to link him to the crime); *Brown v. Illinois*, 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975) (Court held defendant's inculpatory statements inadmissible when defendant was arrested without probable cause or a search warrant for the purpose of questioning during a murder investigation); *Reynolds*, 257 Ill. App. 3d at 805. To determine whether the confession was obtained by exploiting the il-

legality of the arrest, the court must focus on the causal connection between the illegality and the confession. *Dunaway*, 442 U.S. at 217-18, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259; *Reynolds*, 257 Ill. App. 3d at 805. "Thus, if the causal chain between the initial illegality and the evidence sought to be excluded is broken, the link to the evidence is sufficiently attenuated to dissipate the taint of the illegal conduct." *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999).

Factors to be considered in determining whether a confession was the product of an illegal arrest include: (1) whether *Miranda* warnings were given; (2) the proximity in time between the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the police misconduct. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. The State has the burden of establishing the admissibility of the statement. *Brown*, 422 U.S. at 604, 45 L. Ed. 2d at 427, 95 S. Ct. at 2262.

■ First, the presence of *Miranda* warnings alone will not purge the taint from an illegal arrest. *People v. Foskey*, 136 Ill. 2d 66, 86 (1990). In this case, the evidence establishes that Wead was given *Miranda* warnings each time he was questioned by the police. Wead waived his *Miranda* rights on each occasion. The presence of *Miranda* warnings is a factor that weighs in favor of attenuation. *Foskey*, 136 Ill. 2d at 86; *People v. Sneed*, 274 Ill. App. 3d 274, 284 (1995).

Second, we consider the length of time between the illegal arrest and Wead's inculpatory statement. The temporal proximity between an arrest and a confession is often an ambiguous factor, the significance of which will depend upon the particular facts of each case (*People v. White*, 117 Ill. 2d 194, 223-24 (1987)), particularly if there are additional indicia of coercion. *People v. Wilberton*, 348 Ill. App. 3d 82, 86 (2004), citing *People v. Willis*, 344 Ill. App. 3d 868, 886 (2003); *People v. Ollie*, 333 Ill. App. 3d 971, 986 (2002). Where no intervening circumstances are present, a long and illegal detention may in itself impel the defendant to confess. *White*, 117 Ill. 2d at 224. In this case, Wead gave an inculpatory statement to the police 54 hours after his arrest. Rather than dissipating the taint of his illegal arrest, Wead's 54-hour detention was an ongoing violation with cumulative effects. *Willis*, 344 Ill. App. 3d at 886, citing *People v. Franklin*, 115 Ill. 2d 328, 335 (1987). The evidence establishes that each day Wead stayed in the interview room was another day he was forced to go without bathing, brushing his teeth, and changing his clothes. During his detention, Wead had no assurance that he would receive a meal. The police officers' decision to detain Wead in an interview room with no sleeping or washing facilities for 54 hours was coercive in nature.

Courts have held that detaining a suspect without a warrant for

more than 48 hours requires suppression of statements that are unburied of the taint created by the illegal arrest. *Gerstein v. Pugh*, 420 U.S. 103, 125, 43 L. Ed. 2d 54, 71-72, 95 S. Ct. 854, 868-69 (1975) (Court held that "any significant pretrial restraint of liberty" requires a determination of probable cause "made by a judicial officer either before or promptly after arrest"); *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991) (Court held promptness requirement of *Gerstein* requires probable cause determinations within 48 hours of warrantless arrest); 725 ILCS 5/109—1(a) (West 2002) (a person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county). The evidence establishes that from approximately 2:30 p.m., on January 16, 1999, until approximately 8:17 p.m., on January 18, 1999, Wead was detained in an interview room at the police station. After his 54-hour detention in the interview room, Wead made an inculpatory statement. The evidence establishes that Wead was never brought before a neutral magistrate for a probable cause hearing within 48 hours of his warrantless arrest. The State has failed to present any evidence which establishes that an emergency or extraordinary circumstance necessitated Wead's denial of a probable cause hearing for 54 hours after his warrantless arrest. Therefore, since the State has failed to establish that an emergency or extraordinary circumstance occurred that delayed Wead's presentment before a neutral magistrate for a probable cause hearing, Wead's statement must be suppressed because it is unpurged of the primary taint created by the State's violation of *Gerstein* and *McLaughlin*. *McLaughlin*, 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661; *Gerstein*, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854. See *Willis*, 344 Ill. App. 3d at 887; *People v. Mitchell*, 354 Ill. App. 3d 396, 405 (2004). This factor supports suppression of Wead's statement.

Third, our analysis now focuses on whether an intervening circumstance occurred between Wead's illegal arrest on January 16, 1999, and his inculpatory statement on January 18, 1999. Intervening circumstances are an important factor in attenuation because they break the causal connection in the chain between unconstitutional police conduct and a confession. *Wilburton*, 348 Ill. App. 3d at 86, quoting *People v. Austin*, 293 Ill. App. 3d 784, 788 (1997). The confrontation of a defendant with properly obtained evidence which induces a voluntary confession from the defendant will be considered an intervening circumstance. *Foskey*, 136 Ill. 2d at 87; *Ollie*, 333 Ill. App. 3d at 985; see also 4 W. LaFave, Search & Seizure § 11.4(c), at 404 (2d ed. 1987). The State argues that the police confronted Wead with information obtained from Lasa and that this confrontation was

an intervening attenuating circumstance. This argument is devoid of merit. The evidence in the record establishes that Detective Nolan never testified that he confronted Wead with information obtained from Lasa. The State has not presented any evidence which establishes an intervening circumstance that breaks the causal connection between the illegal arrest and Wead's inculpatory statement. Thus, Wead's 54-hour detention in a locked room, in the absence of any intervening circumstance, must be viewed as a factor which weighs in favor of finding that the illegality of Wead's arrest was not purged of the taint by the time he made his statement to the police. This factor supports suppression of Wead's statement.

Finally, the purpose and flagrancy of police misconduct is a key factor in determining whether Wead's inculpatory statement is attenuated from the taint of his illegal arrest. Illegal arrests have been held to be purposeful and flagrant when undertaken solely to conduct "fishing expeditions" in the hope that detaining a defendant would yield evidence of a crime. *Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262 (flagrant police conduct was found where defendant's arrest was undertaken for investigation and without any probable cause, in the hope that something might turn up, and was effected in a manner calculated to cause fright, surprise and confusion). In this case, the evidence establishes that Wead's 3-day, 54-hour detainment was a fishing expedition for evidence to connect Wead to the crime and was initiated by the police with the hope that something might turn up. If only questioning Wead was the goal, the police could have questioned Wead when they stopped him on the street. Based on the 54-hour detention to obtain evidence, this factor also supports suppression of Wead's inculpatory statement.

Finally, after applying United States Supreme Court police custodial confession case law to the *Wade* facts, pursuant to the supervisory order, we apply *People v. Willis*, 215 Ill. 2d 517 (2005), to our facts. In *Willis*, the Illinois Supreme Court explained that in order to determine whether a defendant's confession was voluntary, reviewing courts must consider the totality of the circumstances surrounding the confession along with the following factors: (1) defendant's age; (2) defendant's intelligence; (3) defendant's education; (4) defendant's experience; (5) defendant's physical condition at the time of the detention and interrogation; (6) the duration of the interrogation; (7) the presence of *Miranda* warnings; (8) the presence of any physical or mental abuse; and (9) the legality and duration of the detention. *Willis*, 215 Ill. 2d at 536.

The *Willis* court considered each of the aforementioned factors before making a decision. Willis, the defendant, was 45 years old at

the time of his detention. *Willis*, 215 Ill. 2d at 536. Willis was well educated. He was a college graduate and had received his masters degree in divinity from Andrews University in Berrien Springs, Michigan. *Willis*, 215 Ill. 2d at 536. Willis had prior experience in the criminal justice system; on two separate occasions he had been convicted and sentenced for burglary and robbery. *Willis*, 215 Ill. 2d at 536. At the time of the interrogation and detention, Willis was in good health, requiring no ongoing medical treatment. *Willis*, 215 Ill. 2d at 536.

Willis was interrogated three times during the 73 hours before his confession. *Willis*, 215 Ill. 2d at 536. Willis received *Miranda* warnings each time he was questioned. *Willis*, 215 Ill. 2d at 537. Willis did not complain of physical or psychological abuse. *Willis*, 215 Ill. 2d at 537. During his detention, Willis received food, drink, and cigarettes. *Willis*, 215 Ill. 2d at 537. Willis slept in the lockup. *Willis*, 215 Ill. 2d at 537. Additionally, Willis's initial detention was legal because the police had probable cause to arrest him. *Willis*, 215 Ill. 2d at 538. Although the *Willis* court was troubled by the length of Willis's detention and the delay in presenting him before a judge, the court reviewed the totality of the circumstances and found that Willis's confession was voluntary. *Willis*, 215 Ill. 2d at 536, 538.

██ Our review of the totality of the circumstances and the facts in the present case leads us to the opposite conclusion: Wead's confession was not voluntary. First, and most important, unlike in *Willis*, the police lacked probable cause to arrest Wead. When Wead was initially accosted by Officer Quinn on the street, Wead agreed to accompany the officer to the police station, believing that he would be assisting in a homicide investigation. Wead testified that he was asked to be a witness for a man named Bob Reid. However, once Wead arrived at the police station, his voluntary assistance in a fabricated police investigation turned into an involuntary custodial detention. Indeed, Detective Nolan testified that Wead was not free to leave once he arrived at the police station. Wead's arrest was not based upon probable cause. Officer Quinn testified that prior to accosting Wead on the street, he had no evidence that Wead had committed or was suspected of committing a crime. Furthermore, prior to Wead's statement, Detective Nolan did not have a warrant for Wead's arrest. Moreover, Detective Nolan did not observe Wead commit a crime and he did not have reasonable grounds to believe that Wead had committed a crime. Therefore, there was no probable cause for the arrest and later detention of Wead.

However, probable cause is neither the sole nor the determinative *Willis* factor. *Willis*, 215 Ill. 2d at 536-38. In applying the nine *Willis*

factors to the present case, there are key differences in the facts which culminate in our finding that Wead's confession was not voluntary. At the time of Wead's illegal arrest, detention and interrogation in 1999, he was 53 years old. Unlike Willis, Wead was not well educated. Wead had only achieved a second-grade education, and he was unable to read or write. Detective Henry testified that Wead stated he could not read. Similar to Willis, however, Wead had prior experience in the criminal justice system. Willis had 10 prior adult criminal convictions. However, unlike Willis, who was in good health, Wead was in poor health. At the time of the presentence investigation report, Wead was undergoing treatment at Cermak Hospital for psoriasis of the liver, Hepatitis B and C, emphysema, and tuberculosis. Although Wead denied drug use, Detective Nolan testified that Wead stated he was a drug user. Additionally, Wead was homeless because he was living in a building he was rehabbing at the time of his detention.

Similar to Willis, Wead was detained beyond 48 hours without being presented to a judge for a probable cause determination. "To implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the [United States Supreme] Court has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible." *Gerstein v. Pugh*, 420 U.S. 103, 112, 43 L. Ed. 2d 54, 64, 95 S. Ct. 854, 862 (1975). States must "afford a fair and reliable judicial determination of probable cause either before or 'promptly' after an arrest." *Willis*, 215 Ill. 2d at 526, citing *Gerstein*, 420 U.S. at 125, 43 L. Ed. 2d at 71-72, 95 S. Ct. at 868-69. "[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991). The *Gerstein* promptness requirement was not complied with because Wead was detained for 54 hours before he made a statement and before he was eventually presented to a judge for a probable cause determination. Exceeding the 48-hour *Gerstein* requirement, however, is not determinative of the voluntariness of a confession. See *Willis*, 215 Ill. 2d at 538 (although defendant's 73-hour detention violated the 48-hour *Gerstein* and *McLaughlin* requirement, the totality of the circumstances and an application of the *Willis* factors did not render defendant's statement involuntary).

Wead received *Miranda* warnings each time he was questioned. Although he ultimately declined counsel, Wead asked questions and was unsure if he needed a lawyer and discussed his right to counsel with Assistant State's Attorney Monreal. Wead asked "if it would be good if he got a lawyer." Monreal replied that Wead had a right to an

attorney, but that Wead had not requested one. Wead asked a second time whether it would be good for him to have an attorney. Monreal again responded that Wead had not requested an attorney. Monreal then asked Wead if he wished to have a lawyer present, and Wead declined his right to counsel.

Detective Nolan testified that Wead was given food and allowed to use the restroom. However, Wead's ability to eat and use the restroom was heavily regulated. Wead testified that the only meal he received was a hamburger and Coke on the first day of his 54-hour detention. And Detective Henry testified that at all times he escorted Wead to the restroom so that Wead would not leave the police station. Wead testified that he was escorted the two times he was permitted to use the restroom. Moreover, unlike Willis, Wead was not permitted to sleep in the lockup. Instead, Wead spent two nights on a bench in the interrogation room, without the benefit of bathing, changing his clothes, or brushing his teeth.

Comparing the facts in *Willis* to the facts in this case culminates in our conclusion that there are five *Willis* factors that dictate a different result. Wead's confession was involuntary based upon the following distinguishing factors: (1) his education; (2) his intelligence; (3) his health; (4) his sleeping conditions during his detention; and (5) his arrest without probable cause. The *Willis* court was "troubled by the delay in presenting the defendant before a judge for a probable cause determination" and acknowledged that such a delay raised the inference of police misconduct which at some point could render any confession involuntary. *Willis*, 215 Ill. 2d at 538. *Willis*, however, did not cross that threshold of involuntariness. The present case crossed the voluntariness threshold because, coupled with the 54-hour detention, there was no probable cause to arrest Wead. Additionally, Wead was an uneducated, unhealthy, homeless man with limited intelligence who received very little food during the 54 hours he was at the police station. Wead did not have the benefit of a college and postgraduate education. And his 54-hour detention was exacerbated by the fact that he spent two nights on a bench in the interrogation room, and these facts made the circumstances surrounding Wead's confession extremely egregious. Wead's education and intelligence, his poor health, his sleeping conditions during his detention, and the lack of probable cause for his arrest are the determinative *Willis* factors that render Wead's confession involuntary. Therefore, applying the *Willis* factors to the facts in this case causes this court to conclude that Wead's confession was involuntary.

In conclusion, the evidence establishes that Wead's incriminating statement was the product of his arrest without probable cause, his

poor education, his limited intelligence, his poor health, his sleeping conditions, his lack of facilities to bathe, his restricted use of the restroom, and his 54-hour illegal detention. Applying the factors delineated in the United States Supreme Court cases and in *Willis*, we conclude that Wead's statement was not an act of free will. Therefore, Wead's statement will be suppressed.

In light of the fact we have held that there was no probable cause for Wead's arrest and that Wead's statement must be suppressed, we need not address any other issues raised by Wead in his brief. For the foregoing reasons, we reverse defendant's conviction and remand for a new trial in which the defendant's postarrest statement shall be suppressed.

Reversed and remanded with directions.

GALLAGHER, P.J., and CAMPBELL, J., concur.