2014 IL App (3d) 120239

Opinion filed December 4, 2014

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2014

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal Nos. 3-12-0239 Circuit Nos. 10-CF-209 |
| | ) | |
| DANIEL JACKSON, | ) ) ) | Honorable Glenn H. Collier and Timothy M. Lucas, |
| Defendant-Appellant. | ) | Judges, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Justice McDade specially concurred, with opinion.
Justice Holdridge dissented, with opinion.

**OPINION**

¶ 1        A jury found defendant Daniel Jackson guilty of two counts of first-degree murder.  The

trial court imposed a 65-year term of imprisonment on one count of murder but did not impose a

sentence on the second guilty verdict.  On appeal, defendant contends the trial court erroneously

denied his pretrial motion to quash his arrest and suppress evidence and improperly prevented

defense counsel from emphasizing the involuntary nature of defendant's confession during

closing argument.  Alternatively, defendant submits only one murder conviction can stand based

on one-act, one-crime principles.

¶ 2    We conclude the trial court erred by denying defendant's motion to quash his arrest and suppress evidence. In addition, based on plain error, we hold the trial court violated defendant's due process right to present a complete defense by curtailing defense counsel's closing argument. We reverse both of defendant's murder convictions and, since defendant did not request this court to review the sufficiency of the State's evidence, we remand for further proceedings.

¶ 3                                    FACTS

¶ 4    The State charged defendant with four counts of first-degree murder. Counts III and IV, at issue in this appeal, charged two counts of first-degree murder pursuant to section 9-1(a)(2) of the Criminal Code of 1961, for the August 29, 2009, shooting death of Clifford Harvey. 720 ILCS 5/9-1(a)(2) (West 2010). Prior to trial, defense counsel filed a motion to quash the arrest and suppress evidence alleging police lacked probable cause to support defendant's warrantless arrest on March 2, 2010. Defense counsel also filed a separate motion to suppress statements regarding defendant's March 2, 2010, confession, alleging, in part, defendant did not knowingly and voluntarily waive his *Miranda* rights and the interrogators exerted undue psychological, physical, and mental coercion on defendant to confess.

¶ 5                          I. Suppression Hearing

¶ 6    The court conducted a two-day hearing on defendant's pending motions to quash his arrest and suppress evidence and to suppress statements on December 9 and 30, 2010.

¶ 7              A. Suppression Hearing Testimony of Detective Curry

¶ 8    The first witness, Peoria police detective Shawn Curry, testified he investigated the August 29, 2009, shooting death of Clifford Harvey that occurred in the 900 block of Matthew Street and spoke with an eyewitness, Easton Eibeck, on August 30, 2009. On that date, Eibeck stated he could not identify the gunman but indicated he might be able to identify the gunman in

2

a photographic lineup. Eibeck also admitted he needed treatment for his heroin addiction. Detective Curry explained Eibeck was staying at his father's residence "out in the county by Mapleton" the first time he spoke to Detective Curry on August 30, 2009.

¶ 9     Detective Curry testified he interviewed Eibeck "several times," but Eibeck did not identify defendant as the shooter until the final interview on February 24, 2010, when Curry spoke to Eibeck while he was in custody at the Peoria County jail on unrelated burglary charges.[1] Curry told the court that, once Eibeck moved to a different part of Peoria sometime after the shooting, Eibeck felt "safe *** to now begin revealing more information" and, on February 24, 2010, Eibeck positively identified defendant's photograph as that of the person who shot Harvey.[2] During the same conversation, Eibeck told Detective Curry "Dougie Fresh" had been with defendant at the time of the shooting.

¶ 10     Detective Curry testified Eibeck said he knew defendant by "nickname and face" at the time Harvey was shot. According to Detective Curry, Eibeck "just wanted to flee" and was afraid for his safety if he provided this information sooner. Following Eibeck's positive identification of defendant on February 24, 2010, Detective Curry said he sent out a "49 message," directing patrol officers to arrest defendant for murder. Detective Curry explained that a "49 message" is a "probable cause for arrest" type message.

¶ 11     During cross-examination, Detective Curry agreed that, on the night of the murder, he interviewed Kevin Eggers and Angela Espedal, who allowed Harvey and Eibeck to stay at their house on Antoinette Street. According to Detective Curry, Eggers and Espedal said Eibeck fled

[1] During other parts of his testimony, Detective Curry said he interviewed Eibeck twice, on August 30, 2009, and February 24, 2010.

[2] The record contains the "photo spread" Detective Curry showed to Eibeck which consisted of six, loose but separate, black and white photos of six different black males not arranged in any specific order.

3

to their house immediately after the shooting and told them Harvey had been shot, but stated he did not know the person who shot Harvey. Eibeck told the couple that a group of black male subjects confronted Eibeck and Harvey before the shooting.

¶ 12    Detective Curry testified the first time he had an opportunity to speak to defendant was at the police station shortly after defendant's warrantless arrest on March 2, 2010. Detective Curry and Detective Keith McDaniel recorded this interview, which began when defendant stated he understood his *Miranda* rights at approximately 6 p.m. Detective Curry said the interview lasted approximately two hours and resulted in defendant admitting he shot Harvey because Harvey came at defendant with a screwdriver. Detective Curry testified defendant fainted or "tipped over in his chair" after the interview ended, and it "looked maybe stress related." The court admitted a copy of the DVD of defendant's interview and reviewed it outside the presence of the parties.

¶ 13                    B. Suppression Hearing Testimony of Defendant

¶ 14    Next, defendant, who was 20 years old with a ninth-grade education at the time of his arrest for murder, testified. He told the court, on the day of his arrest, he was at his friend's home with his girlfriend Tori consuming "about six beers," two cups of Paul Mason (a type of whiskey), marijuana, and "popp[ing]" pills "[l]ike Xanax and Ecstasy" just before the officers arrived and took him to the police station. Defendant testified, when he asked the detective if he could call his grandmother during the interview, in his "mind [he] was asking to call [his] grandmother to get a lawyer." Defendant said he did not fully understand he needed to tell the police officers he would like to call an attorney because he "ain't never been in a situation like that before." Defendant felt he needed someone present while the police questioned him.

4

¶ 15       Defendant clarified he had been read his *Miranda* warnings one other time when he was a juvenile, about 12 years old and in middle school, because he hit a girl in gym class after she hit him first. When he asked for his grandma during his only previous interview as a juvenile, the police stopped the interview and contacted his grandma. Defendant said no charges were filed against him for the school incident. Defendant testified he understood his rights, but he "didn't fully understand like how to go about 'em."

¶ 16       Defendant testified, after asking for his grandmother, he also tried to stop the interview, on March 2, 2010, when he "stopped talkin' to them [the detectives] or trying to block 'em out." He said he thought that was how to demand his "right to remain silent" and "quit the interrogation." According to defendant, he began speaking to the officers, after being silent for a period of time, because he "[j]ust got tired of them nagging, constant nagging, nagging, nagging. I'm saying the same thing over and over again, and it just kept continuing."

¶ 17       C. Suppression Hearing Testimony of Tori Roats

¶ 18       Tori Roats, defendant's girlfriend, testified she was with defendant at her friend's aunt's house on March 2, 2010, when the police arrested him. According to Roats, she and defendant consumed alcohol and marijuana before the police arrived and defendant also took Xanax pills. She said defendant was "tipsy" and "woozy" that day. The judge recessed the hearing shortly after Roats' testimony. The judge stated he wanted to view defendant's 2 ½-hour DVD statement.

¶ 19           D.  Suppression Hearing Testimony of Easton Eibeck

¶ 20           On December 30, 2010, the second day of the pretrial motions hearing, Easton Eibeck testified he had an on-going, eight-year addiction problem with heroin and had previous encounters with the police because of his drug problems.  On February 24, 2010, Eibeck said police arrested him at the same Antoinette Street residence (Kevin and Angela's residence) for a theft charge, and took him directly to meet with Detective Curry where the photo identification took place.  According to Eibeck, he was having symptoms of withdrawal from drugs when he spoke to Detective Curry, on February 24, 2010.

¶ 21           Eibeck told the court he knew defendant by face and nickname prior to August 30, 2009, and he told Detective Curry he did not recognize or know the person who shot Harvey the night before.  Later, Eibeck testified he once again told the detectives, on February 24, 2010, he did not know who shot Harvey, but the officers would not accept this explanation and suggested they believed he was scared and "holding something back" when they first interviewed him on August 30, 2009.  Addressing whether he was scared to identify anyone on August 30, 2009, Eibeck testified he was not scared and did not make this statement to the officers.  Eibeck testified, "They came up with that."

¶ 22           Eibeck stated the officers "pushed down my [Eibeck's] throat the person in the picture," who "kind of resembled the person that was there at the shooting," causing Eibeck to point out the photo of defendant.  Eibeck stated, "[F]or some reason they were hellbent on him [defendant] for the shooting.  And I told them I wasn't a hundred percent sure.  I told them from the get-go that I wasn't a hundred percent sure who did it."  Eibeck testified that defendant's photo "was the continuing photo that they [the police] kept showing me."  Eibeck acknowledged to the court that defendant resembled the man who pulled the gun the night of Harvey's death.  Eibeck said, on

6

February 24, 2010, the police asked him if he knew "Dougie Fresh," whose photo was also in the photo spread. Eibeck said he responded that he only knew Dougie from the south side of Peoria.

¶ 23 During the suppression hearing, Eibeck testified that, on the night of the shooting, he had "a frontal view [of the shooter] but it was dark, you know, I was high. * * * It all happened really fast, you know, the whole scenario." Eibeck said he and Harvey passed "four individuals who was heading down Western [Avenue]." After they walked another half of a block, Eibeck said the four men turned around and asked if he and Harvey were "talking shit so-to-speak." Eibeck said he spoke to the four men and told them he and Harvey did not say anything. Eibeck said, "[The four men] just ran up on us. I seen a guy go like this (indicating), reach for what I assumed was a gun, and I ran from there. That was it."

¶ 24 E. Court's Ruling

¶ 25 At the conclusion of the pretrial hearing, the court noted that "probable cause does not mean a full-blown hearing, evidentiary hearing," stating:

"So these police officers go and talk to a person [Eibeck] who was admittedly, everyone agrees, was present at the scene at the time this was committed. First time they try to talk to the guy he runs out the back door of the house. He runs. So it's obvious that he doesn't want to talk to them at that time. I can take those circumstances into consideration.

So when they do get him - - and at first he says that he doesn't - - he gives some indication that he doesn't know - - he gives a general description of the person who committed the offense. Says that he saw this person. He says on the stand today he saw this person reach into * * * his waistband, and he sees the butt of a gun. It's not a coincidence that this is after Mr. Harvey was shot and killed.

7

You know, this is easy as putting two and two together. Gives a general description of that person. Then later gives the name of this individual and picks this person out of a photo lineup and this is what - - and as the State's indicated, probable cause is what the police believe. This is the information, credible information that they've been given by this person. * * *

* * *

Okay. So this is the information that they have. I'm looking at it from what the law requires. Again, you know it would be nice, very nice, if all of these things can be tied up at once if it was nuns and priests and ministers, et cetera, who are the witnesses to crimes, but that generally doesn't happen that way unfortunately you know. So we don't really get into real issues of credibility, et cetera.

It's issues of observation and, you know, motive and those kind of things. And so here's a person who then later indicates that because the police talked to him again say we think you know more, you know, again looking at this, this is a person [Eibeck] who initially ran and they give him some - - and they say we have more information, we've developed other information. * * * He gives them the name of 'Heavy' and later picks him out of a photo ID. I mean what more is needed for probable cause at that point to arrest this individual, the defendant, and then take him in and then have him interrogated?

Okay. So, you know, with all of those things - - and again - - and the officer even explained Mr. Eibeck's reason for saying that he initially withheld information. I mean there's been some discussion. Initially he says he didn't

8

know who it was but then later, I will remind you, that the officer said he said that he gave all of the information later because just he and this other person had moved, they were no longer there, and they were afraid, he had seen somebody get shot, he was afraid, that he was no longer afraid he said. So now he believes that he can give the information. That makes sense. I mean that's not hard to - - I mean that's believable. So the motion to quash [defendant's arrest] is denied."

¶ 26 Regarding the motion to suppress defendant's statement, based on the testimony of the officers and the DVD recording of the interview, the court found defendant knowingly waived his *Miranda* rights and did not exhibit signs of intoxication. Finally, the court found the detectives did not apply undue psychological pressure or physical abuse during the relatively short two-hour interview. The court denied defendant's motion to suppress his confession

¶ 27                                      II. Trial

¶ 28 Defendant's jury trial took place from September 19 through 21, 2011. Officer Anthony Rummans testified that, after arriving on the scene on the night of Harvey's murder, he located a screwdriver, lighter, and a cell phone near the body of the victim but did not locate any shell casings or other physical evidence. Officer Scott Bowers, a crime scene officer, testified he collected the screwdriver, lighter, and cell phone for analysis, but did not locate any physical evidence linking defendant to the crime scene. In addition, officer Bowers explained that shell casings would remain in the cylinder of a revolver while they would be ejected from a semi-automatic weapon, but the failure to locate a shell casing would not necessarily determine the type of weapon the gunman used. Officer Paul Tuttle, another crime scene officer, testified he collected copper jacket fragments from the chest area of the victim's body during the autopsy conducted by Dr. John Denton.

9

¶ 29                     A. Trial Testimony of Angela Espedal

¶ 30          Angela Espedal testified that, a few days before Harvey's death, defendant came to her home, where she lived with her husband Kevin (Eggers). Espedal said defendant was "very irate" and looking for Harvey. According to Espedal, defendant believed Harvey had been selling drugs on their block but had not been "breaking bread," or sharing the proceeds, with them. Espedal acknowledged on cross-examination that she is not technically married to Kevin and agreed she did not contact police regarding the incident between Harvey and defendant. Espedal also admitted she currently had a case pending for unlawful possession of heroin and cocaine and that she had a previous conviction for possession of cocaine. Espedal could not be certain when she had last used illegal drugs prior to Harvey's death on August 29, 2009.

¶ 31                     B. Trial Testimony of Easton Eibeck

¶ 32          Easton Eibeck testified that, on the night of Harvey's death, he and Harvey left Angela Espedal's house to purchase illegal drugs. While walking back on Antoinette Street toward Espedal's house, Eibeck and Harvey encountered a group of four people who demanded both men empty their pockets. Eibeck testified he fled after observing one man reach toward his own waistband. Eibeck could not identify what the individual had been reaching toward, noting he could not "even really say that it was the butt of a gun." According to Eibeck, the area of the street was dark and he was under the influence of a narcotic. He explained to the jury that, even though he was acquainted with defendant prior to the incident, he did not recognize the person who reached into his waistband. As he ran away, Eibeck saw the four people surround Harvey before he heard two gunshots. Eibeck acknowledged he spoke with Detective Curry and said the person in the photo (defendant) "looked like the guy that pulled the gun" but he wasn't 100% certain.

10

¶ 33      Eibeck stated he was currently in custody for possessing a controlled substance and for obstructing justice. He testified his drug of choice was heroin. Eibeck also testified he had some prior felony convictions, including one for unlawful possession of a controlled substance and one for theft.

¶ 34                              C. Trial Testimony of Detective Curry

¶ 35      Detective Shawn Curry testified that, on August 30, 2009, he interviewed Eibeck, who reported he did not know the individuals involved in Harvey's murder, but could identify them "again." When Detective Curry interviewed Eibeck again on February 24, 2010, Eibeck identified a photo of "Heavy" as the person who shot Harvey. Eibeck told Detective Curry three others were with "Heavy" that night, including Dougie Freeman. According to Detective Curry, Eibeck told him four males circled around Harvey. When "Heavy" pulled out a handgun from his waistband, Harvey then pulled out his screwdriver and started to back pedal down the street. During his trial testimony, Detective Curry testified that Eibeck told Detective Curry he saw "Heavy" point the gun toward Harvey, and Eibeck saw Harvey turn to run. Detective Curry testified that while Eibeck was running away, he heard two gunshots.

¶ 36      Detective Curry testified he interviewed defendant on March 2, 2010. After the jury viewed the DVD recording, Detective Curry testified, during cross-examination, that a weapon had never been recovered and they had not located any physical evidence connecting defendant to Harvey's death. Detective Curry acknowledged that, the day after Harvey's death, Eibeck was not able to identify anyone as the person who shot Harvey. Detective Curry agreed Detective McDaniel prevented defendant from speaking with his grandmother and mother during the interrogation.

11

¶ 37          D. State's Exhibit 15A–DVD Recording of March 2, 2010, Interview

¶ 38          State's Exhibit 15A, a recording of defendant's March 2, 2010, interview, opens with defendant entering the room, after removing his belt and other items from his pockets. Defendant sits in a chair at a table and waits for more than five minutes until Detectives Curry and McDaniel enter the room. Detective Curry reads defendant his *Miranda* rights and defendant agrees to talk with the detectives. During the interview, defendant tells the detectives his mom gave him the nickname "Heavy" because he weighed 10 pounds and 12 ounces at birth, after Detective Curry informs defendant he is being questioned about the August 29, 2009, shooting death of Clifford Harvey.

¶ 39          Defendant tells the detectives he knew Harvey through mutual friends, Kevin Eggers and Angie Espedal, and he "got along" with Harvey. Defendant acknowledges he and Harvey had "a couple words" four days before Harvey's death because Harvey had been standing on the street corner near where his little brothers play basketball. Defendant told the detectives Harvey's presence on the corner was attracting police activity and making the block "hot." The detectives and defendant agree Harvey used dope, and defendant states he believed Harvey was waiting on the street corner for someone to "come serve him" drugs. Defendant says he told Harvey to move up the street, but Harvey did not seem upset with defendant's request.

¶ 40          Defendant states that two days after the initial conversation with Harvey, defendant went over to Kevin and Angie's house, where Harvey stayed. Defendant asked Kevin to keep Harvey off the street corner. According to defendant, Harvey was present during this conversation with Kevin, but the discussion was not heated. Detective Curry tells defendant Kevin and Angie gave a version "pretty similar" to defendant's story, but Kevin and Angie said defendant was more upset than defendant admits.

12

¶ 41    Detective Curry also says Doug is presently at the police station telling other detectives the conversation between defendant and Harvey was a little more heated. Defendant acknowledges the victim was mad at him, but Harvey never threatened defendant, and the two did not fight, it was only "words." Defendant tells the detectives he heard about Harvey's death the next morning when he went over to Kevin's house to check on defendant's puppy that he kept kenneled on Kevin's front porch.

¶ 42    Defendant says, on August 29, 2009, he went straight home around 7 or 8 p.m., after working on cars in the neighborhood, and was at home with Tori Roats, her dad, and her brother, for the rest of the night. He denies being with Dougie that night. Detective Curry tells defendant Harvey was with somebody on the night of his murder and asks defendant if he knows who that person was. Responding, defendant says he knows it was the "tall, skinny white boy" but defendant cannot recall his name. Detective Curry says the person's name is Easton Eibeck and defendant recalls that, while he had been working on cars at Randy Cox's house earlier that day, he had seen Harvey and Eibeck together pushing a bike. After Detective Curry asks defendant what he and Doug did after working on cars, defendant repeats that Doug was not with him and denies meeting up with anyone else that night.

¶ 43    Approximately 30 minutes into the interview, Detective Curry tells defendant they know Harvey carried a weapon and that Harvey started making threats as he approached a group of four men the night of his death. Detective Curry then explains to defendant that it would be self-defense to pull out a gun and shoot Harvey as he advanced on the group of men with a weapon. Detective Curry says, "[E]verybody knows [Harvey's] nutty, everybody knows he's crazy." Detective Curry then tells defendant Easton Eibeck "sees everybody. Easton identifies everybody, right."

13

¶ 44    Thirty-six minutes into the recording, defendant again denies being at the scene of the murder and requests to call his grandma. Detective McDaniel tells defendant he and two other people have become primary suspects in Harvey's death. Moments later, Detective McDaniel states that Detective Curry has identified defendant as the "trigger man."

¶ 45    McDaniel emphasizes that defendant needs to "throw [his] hands at the court and walk, and hopefully, minimize the damage" by explaining himself. Unless defendant talks, Detective McDaniel tells defendant, the jury will assume defendant "went over there, maliciously, to kill a person." Defendant repeats that he was not present at the scene, does not know anything about Harvey's murder, and does not carry a gun.

¶ 46    Detective Curry asks defendant why "everybody," including Dougie, would say defendant had been present at Harvey's shooting and defendant says he does not know why Dougie would say that. Detective Curry announces that Dougie told the detectives defendant was defending himself from that "crazy dude that started the whole thing" and that Eibeck's story is similar to Dougie's.

¶ 47    Approximately 45 minutes into the recording, defendant repeatedly requests to call his grandma because he would like her "sitting right here while ya'll talk to me." After Detective McDaniel tells defendant his "grandma can't help" him, defendant asks for his mother to sit with him. Defendant tells the detectives "evidently ya'll not trying to hear what I'm saying, I don't have nothing to do with it, I don't know why my name is brought up in it."

¶ 48    Detective Curry tells defendant they "didn't pull [his] name out of thin air" and defendant states:

> "What happened was ya'll heard that me and Cliff [Harvey] had some words so therefore, not too long before he got killed, so therefore, ya'll, I'm automatically a

14

suspect because we had words.  That's how I see it, but I didn't have nothing to do with it, and I'm telling you I didn't have nothing to do with it, and I know I ain't had nothing to do with it."

Detective McDaniel then reiterates that "not just one person, but multiple people" saw defendant at the scene of Harvey's death.  Approximately 51 minutes into the recording, Detective McDaniel asks defendant if he's a "gambling man" because defendant is "getting ready to shoot dice with your [defendant's] life."

¶ 49    Detective McDaniel adds, "[A]nd I love that word, a jury of your peers, because when you look over you ain't gonna see not one person that look like you, act like you."  Detective McDaniel continues, "So, now we've got stereotypes, we've got a jury of *not* your peers that's gonna judge you, and we've got you not telling."  (Emphasis added.)  Detective McDaniel informs defendant he needs to "explain your [defendant's] actions and how you felt at the time the threat was presented to you.  Notice I said that?  How the threat was presented to you and how you handled it."  Approximately 58 minutes into the recording, defendant reiterates he does not know anything about the shooting, leans back in his chair, puts his arms behind his head, and stares at the ceiling for the next six minutes without speaking.

¶ 50    Approximately one hour into the recording, during defendant's silence, Detective McDaniel tells defendant the goal is to see him "walking on the street a free man."  In further attempts to get a response from defendant, the detectives continue to talk at defendant, telling him Harvey "probably wasn't even sane that night."  Detective Curry tells defendant, "[T]here's plenty of people out there that are stickin' up for ya.  There are plenty of people that are running to your…trying to defend you.  But you're not trying to defend yourself."  The detectives continue to talk to defendant and defendant says, "[N]o, man," and leans forward in his chair and

15

puts his head in his hands on the table and begins to cry.

¶ 51        Detective Curry then asks defendant, "[D]id he come at you? He came at you, didn't he? If he came at you, let me know, because I tell you what, that's what it looks like. I sat out there that night and looked at everything. It looks like he came at you. And you know what, that's what I believe." Detective Curry assures defendant he was "a kid when this happened" and touches defendant's arm. Defendant, while visibly crying, says, "[H]e [Harvey] said he's got me now." Aside from crying, defendant is silent for another seven minutes, while Detective Curry touches defendant on his shoulder and knee and states Harvey carried around "a damn screwdriver and threatening folks with a screwdriver." Breaking his seven-minute silence, defendant asks, "[H]ow would you feel if somebody running at you swinging a screwdriver?" After this question by defendant, defendant does not respond to the detectives for another eight minutes as the detectives continue speaking to defendant before Detective Curry states, "Dan, you already told us what happened, you just haven't told us why."

¶ 52        Defendant responds, "I just wanted to make it home." Defendant then says, "[H]e [Harvey] came, pulled a screwdriver, started coming towards me." Defendant tells detectives Harvey was "walking fast" and "kept coming at me." Urging defendant to continue speaking, Detective Curry touches defendant on his knee and shoulder. Detective McDaniel says, "[H]e's [Harvey] charging, he has this screwdriver, what did you do to protect yourself?" Defendant, crying, responds, "I shot," but "just wanted to scare him." Defendant does not respond when Detective McDaniel asks if defendant remembers how many times he fired the gun at Harvey.

¶ 53        Changing topics, Detective McDaniel asks defendant if two days had passed between defendant's initial confrontation with Harvey on the street corner and the night Harvey confronted defendant on August 29, 2009. Defendant corrects Detective McDaniel by stating it

16

had been four days.  Defendant tells the detectives he played basketball with children who were aged 16, 15, and 11 years old.  Defendant states that, since he is the oldest in the group, he asked Harvey to stop standing on the street corner attracting attention from the police, four days before his death.

¶ 54    Detective Curry then says, "[T]he night that everything went down, there was four of you, right?  You and a couple other people, right?  Who was with you?  Was Doug there?  Was Bob [defendant's cousin] there?  Because these people can help you out.  You know, they can say, '[H]e was crazy, he was on dope, he came at me.' "  In response, defendant states, "[T]here wasn't nobody with me."  Defendant adds, "[I]t was me walking, I was coming from the store and there were some guys walking down the street, they wasn't with me."

¶ 55    Detective Curry asks defendant what type of gun he used and what he did with the gun after the shooting.  Defendant says he "threw it while [he] was running."  Detective Curry repeatedly asks defendant what type of gun defendant used.  Defendant mumbles an inaudible response and Detective Curry loudly and clearly states, "[I]t was a revolver then, huh?"  Detective Curry again asks defendant where he threw the weapon.  Defendant responds that he "just flung it."  Detective Curry asks defendant, "[S]o, the boys, the other people in the area, they weren't with you?"  Defendant nods "yes."

¶ 56    Defendant, while crying, tells the detectives he is a "pretty polite person" who can sometimes get agitated.  Defendant says he is raising a baby girl, who is not his biological daughter.  The detectives tell defendant they are going to get him something to eat and a cigarette, and defendant requests to see his mom.  The detectives then leave the room.

¶ 57    After waiting approximately 15 minutes, defendant knocks on the locked door to request to use the bathroom.  Upon his return, defendant waits alone until Detective Curry reenters with

17

a cigarette. Approximately 38 minutes after the detectives left the room ending the interview, defendant loses consciousness and falls out of his chair to the floor.

¶ 58    Detective McDaniel returns and requests that someone call for a paramedic. Detective McDaniel checks for and finds a pulse but is unable to revive defendant for a few minutes. Defendant then awakens, crying, and the detectives place him in a chair. Defendant continues to sob, and coughs and gags heavily or vomits, while trying to catch his breath. Defendant tells the paramedics his head is pounding and he feels dizzy. The video ends with paramedics walking defendant out of the room.

¶ 59                        E.  Trial Testimony of Dr. Jason Stringer

¶ 60    The State also presented the testimony of Jason Stringer, a physician who examined defendant at the emergency room after his police interview. According to Stringer, defendant's chief complaints on arrival were headache and nausea. Defendant indicated to Stringer, during his examination, that he used marijuana, but Stringer did not observe any obvious signs of intoxication. On cross-examination, Stringer testified that he had not been told, prior to treating defendant, that defendant may have fainted.

¶ 61                        F.  Trial Testimony of Forensic Pathologist

¶ 62    The State then called John Denton, the forensic pathologist who conducted Harvey's autopsy. Denton testified Harvey suffered multiple linear scrapes and abrasions on the back of his left elbow, on his chin, and on both forearms and knees. Denton explained the direction of the scrapes indicate forward motion as the body moves against a rough surface. According to Denton, Harvey had a "lethal through and through gunshot wound" to his back, with an exit wound in his chest. Denton stated that Harvey's blood tested positive for cocaine and marijuana. During his examination of Harvey, Denton located small copper jackets and bullet fragments,

18

near the track of the wound, which he packaged and provided to the police.

¶ 63                          G. Stipulated Evidence

¶ 64          The parties stipulated to the testimony of court reporter Kathy Smith, who would testify that, during the suppression hearing, Eibeck stated "I told them that I seen the butt of a gun. That's all I seen."

¶ 65          After the conclusion of the State's evidence, defendant moved for a directed verdict, which the court denied. Defendant did not present evidence at trial.

¶ 66                          H. State's Closing Argument

¶ 67          During closing argument, the prosecutor suggested Espedal's testimony, and defendant's confession, established that defendant and Harvey had a disagreement a few days prior to Harvey's death because Harvey had been standing on the street corner. The prosecutor pointed out Eibeck's positive photo identification of defendant showed defendant was the man who had pulled the gun out of his waistband the night of Harvey's murder. The prosecutor argued:

> "And how do we know that [Eibeck's] identification is accurate? Because he got the right guy. And how did we know he got the right guy? The defendant confessed. Out of all the people that Easton Eibeck could have picked out from Peoria, out of the six people that he had a choice of picking out in that photo array, what are the chances that he's just going to randomly pick the guy who would later confess, who would later admit that he did it?"

Turning to address defendant's confession, the prosecutor argued defendant's confession suggested self-defense because defendant wanted to minimize his involvement in Harvey's death. The prosecutor noted defendant minimized the nature of the "disagreement" between defendant and Harvey.

19

¶ 68                    I. Defense Counsel's Closing Argument

¶ 69        Defense counsel began closing argument by directing the jury's attention to the testimony of the police officers. Defense counsel noted that none of the officers located any physical evidence connecting defendant to Harvey's murder. Next, defense counsel addressed the testimony presented by Angela Espedal by arguing she lied about her marital status and she is an admitted cocaine user. Counsel also noted that, despite the alleged uncomfortable and threatening nature of defendant's comments at her house regarding Harvey's sale of drugs on the corner, Espedal did not contact police.

¶ 70        Next, defense counsel stated that Easton Eibeck, an admitted heroin user, told Curry he was not 100% sure of his identification of defendant. In addition, counsel referred the jury to Eibeck's testimony that he could not identify who killed Harvey.

¶ 71        Turning to the interrogation, counsel stated: "Let's talk about Detective Curry and the alleged confession for a moment. The State likes to use that word confession. I choose not to. That in mine [*sic*], folks, and it will be for you to determine, is something less than a confession." Defense counsel also noted defendant was a "young man being questioned by two very seasoned law enforcement" officers in a small room, during which the officers "took turns" questioning defendant. Defense counsel argued the officers "worked on [defendant] over time in that room not letting [defendant] talk to his either [*sic*] grandmother or mom over time." Defense counsel further asserted:

> "[A]n hour and a half into it [defendant] made a couple of comments and
> thereafter [the interviewing detectives] had surprised, supplied [defendant] with
> details. This is not a confession. This is not a product of free will. Ask yourself

20

if what you saw is a product of free will or was it a product of them working on him over time. There is a difference."

Defense counsel argued Detective McDaniel was a "very smooth talking gentleman" trying to convince defendant to "minimize the damage" during the interrogation. Defense counsel continued by arguing, "Folks, you heard it. This was not a product of [defendant's] free will. This was not a confession." At that point, the State objected.

¶ 72 Following the State's objection, the court requested both attorneys to approach the bench.[3] After the sidebar conference off the record, the court announced:

"For the record, show the parties were at side bar pursuant to the last objection posed by the [State]. That objection is accordingly sustained. The jury is at this time instructed to disregard the last comment as to [defense counsel's] referring to the statement as being involuntary in nature."

¶ 73                    J. Jury Deliberations, Posttrial Motion, and Sentencing

¶ 74 Jury deliberations began on September 21, 2011. During deliberations, the jury requested to view a portion of the DVD recording and the court provided the jury with an opportunity to review the relevant portions of the DVD. The jury concluded their deliberations by returning guilty verdicts on both counts, III and IV, for first-degree murder.

¶ 75 The trial court denied defendant's amended motion for judgment notwithstanding the verdict or for a new trial on March 16, 2012, alleging, among other things, the trial court erred when it denied his pretrial motion to quash his arrest and suppress evidence. After this denial of a request for new trial, the court immediately began the sentencing hearing. The presentence investigation report showed defendant had been charged with a few previous ordinance

---

[3] The contents of the sidebar conference are not included in the record on appeal.

violations and one misdemeanor cannabis charge.  After hearing arguments from both attorneys, the court imposed an aggregate 65-year sentence for one count of first-degree murder as alleged in count three of the indictment.  Defendant appeals.

¶ 76                                ANALYSIS

¶ 77                    I.  Motion to Quash and Suppress

¶ 78        On appeal, defendant first contends the trial court erroneously denied his pretrial motion to quash his arrest and suppress evidence.  Consequently, defendant seeks the reversal of his murder convictions and requests a new trial.  The State does not dispute defendant was arrested without a warrant and directly transported to the police department for interrogation.  However, the State claims probable cause existed for defendant's warrantless arrest based on Eibeck's positive identification of defendant as the individual who shot Harvey.  Therefore, the State contends the confession followed a proper arrest and was admissible.

¶ 79        When reviewing a circuit court's ruling on a motion to suppress, this court is presented with mixed questions of law and fact.  *People v. Lee,* 214 Ill. 2d 476, 483 (2005).  The circuit court's findings of historical fact are given deference because the circuit court is in "a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony."  *Lee*, 214 Ill. 2d at 483-84.  These factual findings will be upheld on review unless such findings are against the manifest weight of the evidence. *Id.* at 483; *People v. Hackett*, 2012 IL 111781, ¶ 18; *People v. Luedemann,* 222 Ill. 2d 530, 542 (2006).

¶ 80        In this case, during the suppression hearing, Detective Curry testified the shooting took place in the "900 block of Matthew Street."  Detective Curry stated that Eibeck told Detective Curry he was initially afraid to identify the shooter but felt safe to make an identification on

22

February 24, 2010, because Eibeck had moved out of the neighborhood. Detective Curry denied Eibeck was less than certain when he selected defendant's photo.

¶ 81 However, Eibeck told the court during his suppression hearing testimony that he and Harvey were confronted by four men on Western Avenue immediately before the shooting. Eibeck explained to the judge he clearly told Detective Curry on February 24, 2010, that he was not 100% certain the person in the photo was the gunman. Eibeck told the court, when he identified defendant's photo six months after the murder, he did so only because Detective Curry was "continuing" to place defendant's photo in front of him. Eibeck denied he told Detective Curry he was afraid to make an earlier identification of defendant, who was known to him in August 2009, and advised the court the detectives "came up with that."

¶ 82 When resolving the conflicting testimony of Detective Curry and Eibeck in order to make the necessary finding of fact, the court stated:

"Initially [Eibeck] says he didn't know who it was but then later, I will remind you, that the officer said he said that he gave all of the information later because just he and this other person had moved, they were no longer there, and they were afraid, he had seen somebody get shot, he was afraid, that he was no longer afraid he said. So now he believes that he can give the information. That makes sense. I mean that's not hard to - - I mean that's believable."

We give great deference to, and will not disturb, the trial court's finding of fact that Eibeck selected defendant's photo on February 24, 2010, without hesitation and provided a plausible explanation of his failure to do so on an earlier occasion.

¶ 83 However, on review, this court remains free to undertake its own assessment of the facts, as determined by the trial court, and may draw its own conclusions regarding how those facts

23

impact the legal issues presented to the trial court when deciding what relief should be granted. *Lee*, 214 Ill. 2d at 484; *Hackett*, 2012 IL 111781, ¶ 18; *Luedemann,* 222 Ill. 2d at 542. Accordingly, we review *de novo* the ultimate question of whether the evidence should be suppressed*. Id.*

¶ 84        As in the case at bar, third-party information, such as Eibeck's, will support a finding of probable cause for a warrantless arrest, regardless of whether the source of the information is an eyewitness or other witness, *as long as* the information provided by a third party bears some independent indicia of reliability. *People v. Arnold*, 349 Ill. App. 3d 668, 672 (2004) (citing *People v. Sturdivant*, 99 Ill. App. 3d 370, 373 (1981), and *People v. Adams*, 131 Ill. 2d 387, 397 (1989)). An indicia of the reliability of information provided by a third party "exists when the facts learned through a police investigation independently verify a substantial part of the information" provided by the third party. *Arnold,* 349 Ill. App. 3d at 672 (citing *People v. James,* 118 Ill. 2d 214, 225 (1987)). Further, the personal reliability of the third party himself, or in this case, Eibeck, must also be considered in the totality of the circumstances approach to determine the existence of probable cause. See *Adams,* 131 Ill. 2d at 397. Clearly, the trial court in this case incorrectly believed the credibility of Eibeck was not relevant when the court stated it would not "get into real issues of credibility" when evaluating probable cause with respect to the motion to quash.

¶ 85        The case law provides that a police officer can effectuate a warrantless arrest of an individual if the officer has reasonable grounds to believe the person has committed an offense (725 ILCS 5/107-2(1)(c) (West 2010)), and, in this context, "reasonable grounds" has the same meaning as "probable cause." *Lee*, 214 Ill. 2d at 484; *People v. Tisler*, 103 Ill. 2d 226, 236-37 (1984). Whether there is probable cause to believe that a defendant has committed a crime is

based on an evaluation by the court of all the information available to the police, including the source of the information, considered under a totality of the circumstances approach. *Lee*, 214 Ill. 2d at 485. The probable cause inquiry must focus on what was done and known by the police officers, not on what the police officers believed and what the facts *objectively* add up to, not what the officer *believed* they added up to. *Id.*

¶ 86    As noted by Justice McDade in her separate specially concurring decision, the State either did not make an attempt to secure an arrest warrant or, perhaps, was unable to secure an arrest warrant between February 24, 2010, and the date defendant was taken into custody several days later on March 2, 2010. What followed the arrest, which was not authorized by an arrest warrant issued by a neutral judge, was a skillful and intense custodial interrogation. As accurately described by Justice McDade, the coercive questioning focused primarily on defendant's race and the detectives' prediction that defendant's guilt or innocence would be decided by a jury of "not" his peers who would be predisposed to convict defendant based on the unlawful conduct of other young black males as reported by the local media.

¶ 87    The tactics employed by the detectives were successful and yielded a confession. However, the commentary of Detective McDaniel, with respect to the integrity of the system of justice in Peoria County, is difficult to read, and even more difficult to overlook, because appellate defense counsel has not raised the issue of the voluntariness of defendant's confession for our review. Nonetheless, while I strongly agree with all of the points raised by my respected colleague, Justice McDade, I share her observation that the obvious involuntariness of the confession is not properly before this court.

¶ 88    Instead, we must focus on whether Detective Curry had probable cause to believe defendant murdered Harvey, and, most importantly, whether the trial court in this case

25

objectively evaluated *all* of the information available to Detective Curry at the time Detective Curry concluded there was probable cause to issue a "49 memo" to fellow officers and effectuate the warrantless arrest at issue. *Lee*, 214 Ill. 2d at 485. Contrary to the well-established case law, the trial court focused on only one piece of information, Eibeck's photo identification, before finding probable cause existed. Of course, the trial court's decision to focus on one piece of information is understandable, since the motion to suppress a murder confession was simultaneously considered by the court with the motion to quash the warrantless arrest. In fact, the trial court took care to review the contents of the videotaped confession, before ruling on the motion to quash the arrest. Respectfully, one must wonder whether the contents of the recorded confession itself may have unintentionally influenced the court's finding of probable cause when defendant challenged his warrantless arrest prior to trial.

¶ 89     For purpose of the issue related to probable cause which is subject to our review, we focus on the information available to Detective Curry prior to the warrantless arrest relative to the factual events and the issue of Eibeck's credibility on February 24, 2010. On August 29, 2010, Detective Curry learned Harvey's body was found on Matthew Street, and he spoke to Egger and Espedal, who told the detective defendant and Harvey exchanged words four days before Harvey's murder. In addition, the couple also told Detective Curry on August 29, 2010, that Eibeck was with Harvey at the time of the shooting but did not recognize the gunman.

¶ 90     The next day, on August 30, 2010, Detective Curry spoke to Eibeck, who confirmed he was with Harvey just before the shooting but learned from Eibeck that he could not identify the gunman *and* needed treatment for his heroin addiction. Detective Curry did not speak to Eibeck or develop new reliable information in the case for the next six months.

¶ 91    Then, six months after the murder, Detective Curry discovered Eibeck had just been apprehended for theft and was at the jail. Consequently, with Eibeck in custody and unable to avoid a conversation with Detective Curry, Detective Curry brought an array of six photos to the jail for Eibeck to view. Eibeck allegedly told Detective Curry he now felt safe to make the identification after leaving the neighborhood. However, Eibeck was apprehended by the police at Egger and Espedal's residence, where he and Harvey were residing on the night of his murder, just before Eibeck selected defendant's photo. While in custody on February 24, 2010, six months after the murder, Eibeck selected defendant's photo as the person named "Heavy," which precipitated prompt action by Detective Curry to issued the "49 memo" for a warrantless arrest for murder without first obtaining an arrest warrant.

¶ 92    The trial court also learned during the suppression hearing that Eibeck knew defendant by "face and nickname" prior to August 30, 2010, but told both Detective Curry and Harvey's housemates that he did not recognize the person who shot Harvey. Under oath, Eibeck corroborated Detective Curry's testimony that he told the police, on August 30, 2009, that he did not recognize the gunman and could not identify the shooter. In addition, Eibeck explained to the court, during his testimony, that it was dark at the time of the murder, he was high, and the events unfolded quickly. When describing the events Eibeck personally witnessed on the night of the murder, Eibeck testified, during the suppression hearing, as follows: "[The four men] just ran up on us. I seen a guy go like this (indicating), reach for what I assumed was a gun, and I ran from there. That was it." Eibeck testified these events occurred on Western Avenue. It is undisputed that Eibeck, a convicted felon with a heroin addiction, was high on August 29, 2009. In addition, Eibeck reported he was suffering from drug withdrawal on February 24, 2010, when he selected defendant's photo for Detective Curry on that date.

¶ 93        Detective Curry's investigation did not uncover any physical evidence or another witness placing defendant either on Western Avenue in the company of four black men, or in the 900 block of Matthew Street, at the time of the shooting.  Thus, Detective Curry was unable to unearth any independent evidence corroborating the details reported by Eibeck.  Based on an objective view of the totality of all of the facts and circumstances revealed to the court during the suppression hearing, we conclude probable cause did not exist for defendant's warrantless arrest and the ensuing custodial interrogation on March 2, 2010.

¶ 94        It is well established that evidence obtained as a result of an illegal detention or arrest must be suppressed absent significant intervening circumstances to purge the taint of the illegal arrest.  *People v. Wead*, 363 Ill. App. 3d 121, 138 (2005) (citing *Dunaway v. New York*, 442 U.S. 200, 219 (1979)).  Thus, inculpatory statements, made by a defendant as a result of an arrest without probable cause, are not admissible unless some intervening circumstances exist.  *Wead*, 363 Ill. App. 3d at 138.  In the case at bar, there were no intervening circumstances to purge the taint of the unlawful arrest, therefore, defendant's videotaped statement is inadmissible and should have been suppressed.  For this reason, we reverse defendant's convictions for murder and remand for further proceedings since defendant did not request this court to review the sufficiency of the State's evidence absent the coerced confession.

¶ 95                            II.  Closing Argument

¶ 96        As discussed above, this panel, with one dissenting justice, has determined that defendant's murder conviction should be reversed and the matter remanded for further proceedings because defendant has not requested this court to evaluate the sufficiency of the evidence as part of this appeal.  A determination of whether the State wishes to retry defendant will be determined in the trial court.  Therefore, it is unnecessary to address defendant's second

28

contention of error pertaining to closing argument since the conviction is being set aside on other grounds.

¶ 97    However, in the interest of providing a complete analysis of the issues raised in this appeal, even though the closing argument issue is not outcome determinative, I wish to express my own views with respect to whether plain error is present in this record because of the trial court's ruling during closing argument. My respected colleagues do not share my views, singularly expressed as set forth below.

¶ 98    Defendant urges this court to consider whether the trial court prevented defense counsel from fully developing his argument that defendant's confession was unreliable during defense counsel's closing argument. I agree with the State that the error, if any, was not properly preserved for our review and can only be considered if it rises to the level of plain error. I believe the record reveals plain error occurred. Plain error allows this court to consider forfeited issues when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant; or (2) the error is so serious that it affected the fairness of defendant's trial and the integrity of the judicial process, regardless of the closeness of the evidence. *People. v. Herron*, 215 Ill. 2d 167, 178-79 (2005).

¶ 99    The first step in determining whether plain error occurred is to determine whether error occurred at all. *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31. In a criminal trial, defense counsel must be given an opportunity to fully and fairly argue his cause. *People v. Crawford*, 343 Ill. App. 3d 1050, 1059 (2003). Yet, the regulation of the substance and style of closing argument lies within the trial court's discretion and, thus, the court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *People v. Meeks*, 382 Ill. App. 3d 81, 84 (2008). In this case, after attacking the credibility of the State's

29

witnesses, defense counsel turned his focus toward attacking the reliability of defendant's own words, his confession, and the cornerstone of the State's case.

¶ 100    Defense counsel argued the "seasoned" detectives relentlessly questioned defendant for two hours, in a small room, after preventing defendant from consulting with his grandmother or mother during his interrogation.  In addition, defense counsel argued defendant did not have any personal knowledge of what happened on the night of the murder.  In fact, according to defense counsel's argument, defendant did not provide a single incriminating detail which was not first revealed to defendant by the detectives.  In other words, it appeared defendant regurgitated the details the detectives provided to him in order to simply end the uncomfortable interrogation.

¶ 101    Turning to Detective McDaniel, who did not testify before the jury, defense counsel described him as the "very smooth talking gentleman" on the recording.  Defense counsel observed, "[t]his is not a confession.  This is not a product of free will," and separately emphasized, "Folks, you heard it.  This was not a product of [defendant's] free will.  This was not a confession."

¶ 102    At this point, the prosecutor objected and defense counsel stopped his closing argument. The trial court sustained the State's objection and  stated:

> "For the record, show the parties were at side bar pursuant to the last objection posed by the [State.]  That objection is accordingly sustained.  The jury is at this time instructed to disregard the last comment as to [defense counsel's] referring to the statement as being involuntary in nature."

I note, after the court's ruling, defense counsel did not continue his discussion of Detective McDaniel's role in the confession.  Instead, defense counsel simply concluded his closing argument.

¶ 103    By instructing the jury to "disregard" defense counsel's last comment that the confession was "involuntary," the court effectively negated defense counsel's closing argument with respect to the reliability of defendant's confession. The case law provides a defendant may always present evidence during trial to challenge the reliability of a confession which the trial court found to be voluntary and admissible prior to trial. *People v. Jefferson*, 184 Ill. 2d 486, 498 (1998). Based on this case law, I submit defense counsel should have been allowed wide latitude to fully and fairly summarize how Detective McDaniel's comments resulted in a false confession the jury should reject. I conclude the trial court erred by advising the jury to disregard defense counsel's comment about defendant's free will.

¶ 104    Next, I consider whether the evidence was closely balanced. When analyzing whether the State's evidence in this case was closely balanced, a court must make a common sense assessment of the evidence within the context of the circumstances of the individual case. *People v. Adams,* 2012 IL 111168, ¶ 22.

¶ 105    I point out, as a former prosecutor, that the prosecution cannot sustain its burden of proof, beyond a reasonable doubt, when an accused's out-of-court confession is not corroborated by some independent evidence offered by the State. *People v. Lara*, 2012 IL 112370, ¶ 17. This case law grows out of a well-founded, historical mistrust of out-of-court confessions resulting from an individual's tendency to confess, for various psychological reasons, to offenses he or she did not commit. *Id.* ¶ 19. In this case, defendant told the detectives that Harvey was "walking fast" and "kept coming at me [defendant]" before he fired the gun.

¶ 106    In stark contrast, the State's undisputed physical evidence proved Harvey suffered a single gunshot wound in the back while running *away* from the gunman. The State's evidence did not corroborate, and in fact contradicted, defendant's confession. Further, both detectives

31

appeared unaware at the time of the interrogation that Harvey's bloody chest wound, visible on the night of the murder, was the exit point, rather than the entry point, for the fatal shot. Defendant's confession mirrored the misunderstanding of the detectives and was refuted by the physical evidence introduced at trial.

¶ 107    After carefully considering all of the evidence presented by the State concerning defendant's motive, opportunity, and confession, I conclude the evidence was less than closely balanced and, in fact, was insufficient. Therefore, I would not only reach the closing argument issue based on plain error, I would reverse the jury verdict on the basis of the court's ruling truncating defense counsel's closing argument. However, my respected colleagues correctly point out this closing argument issue need not be addressed in light of our non-unanimous decision on the issue of probable cause.

¶ 108                                    CONCLUSION

¶ 109    For the foregoing reasons, this court reverse's the judgment of the circuit court of Peoria County after considering the merits of the probable cause issue alone, and remands for further proceedings.

¶ 110    Reversed and remanded.

¶ 111    JUSTICE McDADE, specially concurring.

¶ 112    The author judge in this case has concluded, in considering the totality of the circumstances of the investigation into the shooting death of Clifford Harvey on August 29, 2009, that the police lacked probable cause to arrest defendant, Daniel Jackson. In light of the fact that the police were unable to find any forensic evidence of either Jackson's presence at the scene or complicity in the crime other than Easton Eibeck's avowedly extorted and ambivalent

identification of Jackson's picture in a photo array, I would concur with the carefully reasoned holding that the police lacked probable cause to arrest.

¶ 113    Moreover, I believe the conduct of the primary investigators strongly suggests that they *knew* they were lacking probable cause. Eibeck's problematic identification from the photo array was secured on February 24, 2010. When Jackson was taken into custody on March 2, 2010, *six days later*, that arrest was not pursuant to a warrant approved by a neutral magistrate. Instead, Detective Curry issued something he called a "49 memo" advising other officers that he had probable cause to arrest Jackson and directing that the suspect be picked up. There was more than enough time to have gotten a proper arrest warrant. The fact that the detectives did not have a warrant supports a reasonable inference that either they or a judge recognized that they did not have probable cause. For this reason and the other reasons discussed in the author's analysis, I concur in the determination that the police lacked probable cause to arrest Daniel Jackson and that the motion to suppress should have been granted. I agree with remand for a new trial without any evidence, including the confession, improperly secured in the absence of probable cause.

¶ 114    Because I agree with the probable cause finding, I do not reach the closing argument issue.

¶ 115    I also write separately to address an issue which is not properly before us in this appeal— whether the trial court erred in finding, on the motion to suppress, that Daniel Jackson's confession was voluntary. The two law enforcement officers interrogating Jackson on March 2, 2010 -- Detective Curry and Detective McDaniel -- are, as investigating officers, integral parts of a criminal justice hierarchy charged, at interlocking levels, with finding those who may have committed crimes and subjecting them to criminal procedures designed to ascertain their guilt or

innocence. The conduct of the police officers and the integrity of their investigation have a profound impact on the correctness of the ultimate outcome of a case. In a case such as this where their efforts result in a confession, their impact is very often dispositive.

¶ 116      The DVD demonstrates that Daniel Jackson's confession was coerced, garnered by these officers, and, therefore, involuntary.

¶ 117      The coercion occurred in plain sight and was clearly shown on the DVD that was reviewed by two circuit court judges prior to finding, inexplicably, that the confession had been intelligently, freely and voluntarily given. Although I view the entire interrogation as rife with prohibited conduct casting doubt on its reliability, I believe actual coercion is more than amply documented by a single period of approximately 6 minutes, shown, roughly, between 50:29 and 57:00 of the DVD.

¶ 118      A little over 50 minutes into the tape, Detective McDaniel, who until that point had mostly sat quietly while Detective Curry took the lead, became actively and aggressively involved. His trigger appears to have been Jackson's requests that he be allowed to have, first his grandmother and, failing that, his mother, in the room with him. After assuring Jackson that these family members could not help him, McDaniel gets to work. He suggests some understanding of Jackson and his situation. It is clear that McDaniel, like Jackson, is black and he strengthens this connection by telling Jackson he lived in a neighborhood in Chicago where "shit like that happened." He tells him that "the common person will look at this and say you did it."

¶ 119      Pointing to Curry, McDaniel tells Jackson that "he has people who were there who'll stand up and testify you did it. You may find someone who's a relative–you understand I'm saying who's a relative—to say you were on Western Street" (and Curry adds "or your baby

mama"), "but people he [Curry] has talked to are believable because they have no reason, nothing to do with you."

¶ 120    McDaniel then asks Jackson if he is a gambling man and, when he says he is not, the detective demands, "monopoly? checkers? ***shooting dice?" and Jackson says he has shot dice with his cousin. McDaniel then tells him he is shooting dice with his life. "You are shaking the dice right now. Either you can roll right, tell Detective Curry what's going on, shake your hands at the court and hopefully minimize the damage that has been done or you can wait and see what's in our hand, see how many dice we're gonna throw at you when it comes time for a trial. We're giving you the opportunity to explain yourself, explain your actions. Don't let nobody else explain your actions 'cuz you're not gonna like the outcome if somebody has to explain what's going on with you."

¶ 121    McDaniel continues:

"Okay, if you haven't paid any attention, young man, to the media—and the media does a lot of things. Every time you open up the newspaper, what do you see? [Jackson is silent.] You don't open up newspapers? [No.] Okay, do you look at the news? I'm talkin' about violence. Every time I turn on the news I know what I see. When you turn on the TV what do you see? Every time they're talking about a shooting in Peoria, who're they talking about? Every time you hear about brawls at the club, who they talkin' about? Young, African American males, okay? So now we got the media drumming up that *we* just buck-assed wild and acting a fool, right? *The judges have seen and they heard it—they*

35

*heard it all, okay.* So now you'll come in front of one and they'll hear it and they'll ask if you want to plead innocent or guilty and you'll say 'not guilty.' So they'll say okay, you choose. Jury trial? Bench trial? *Now, this is what you need to be concerned about. Those same people who open up the paper every day or look at the news see how wild black folks are. What do you think is going to happen to you when you walk in front of them? How do you think they're going to view you?* Are they gonna view you for the government thing that your parents gave you or are they gonna start workin' off of what? Mere stereotypes of what the hell's going on down in the south end? *And what are the stereotypes nowadays of young black men between the ages of 13 and 24?* What they think we're doing? C'mon, it's a honest question. What do they think we're doing? Want me to answer for you? Robbing, stealing, shooting, killing, making babies, ain't taking care of babies, they ain't working, they ain't going to school, they got idle time on their hands; and they get tired of that shit.

So now you think, okay, that you're gonna get a jury of your peers. And I love that word, a jury of your peers, because when you look over you ain't gonna see not one person that look like you, act like you. They're not gonna understand how the hype is hanging out on the corner acting like a damn fool because they are law-abiding citizens, because they pay taxes. They

36

gonna pick up the phone and call the police and let us do our job. They ain't gonna go over there and handle it day after day after day running their mouth and all that other stuff. They gonna call the police. You understand where I'm going with this, right? [Jackson says 'I understand.'] So now, we got stereotypes, we got a jury of *not* your peers that's gonna judge you, and we got you not telling. You're gonna have all these people telling, no matter what their backgrounds. They could be drug addicts, they could be your friends getting up there testifying about how you were there and how you\*\*\*how my partner plays it—the dude got wild, you pulled out a weapon, you took care of the business. How is it gonna sit for you? I can't tell you what to do; *we can only present what you're lookin at, okay?* And we hope that at some point, you become a man and all you have is your word. Explain your actions. Don't worry about anybody else's actions around you. *Explain your actions and how you felt at the time the threat was presented to you. Notice how I said that; how the threat was presented to you and how you handled it."* (Emphases added.)

The foregoing excerpt does not reflect all of the references to newspapers and television, nor does it include a statement that Jackson is about to brand himself as a cold-blooded killer, but it amply demonstrates the tenor of what Jackson was told.

¶ 122        Detective McDaniel has just told Jackson that he needs to confess that he killed Clifford Harvey in self-defense because he cannot get a fair trial in Peoria because he is a young, African American male—something he has no power to change.  He told him that the judges and the potential jurors have been reading the media coverage of what is going on in the south end, they are sick of it, and they will be working off of stereotypes when he appears before them for trial.  Moreover, not only will the stereotypes apply to him, they will also negate the credibility of any witnesses he might call.

¶ 123        The bone-chilling subtext in McDaniel's virtual monolog is that the police could pick up *any* young African-American male and he could be convicted, even if he does not confess, because the judges and jurors will be driven by media-hyped stereotypes and either will not hear or will not be open to any defense he would put on.  It is hard to imagine anything more blatantly coercive than telling a suspect, whether it is true or false, that he needs to confess to killing the victim, claim self-defense and minimize his damages because, even if he is innocent, our system of justice will not work for him because he is young and black and male.

¶ 124        There is no more damning evidence that can be presented against a criminal defendant than his or her own confession of guilt.  If the confession is on audio/video tape and the jury can see it, it can become even more potent.  The court's finding that a confession was voluntary reduces, as a practical matter, the obligation to carefully evaluate its reliability.  There is no need for the fact finder to weigh the evidence against the defendant—he confessed.  Nor is there any need to consider anything raised in defense—she confessed.  All of the processes set up to test the strength and persuasiveness of the extrinsic evidence, if any, are obviated—he confessed.

¶ 125    As Justice Brennan, dissenting from the decision in *Colorado v. Connelly*, 479 U.S. 157 (1986), and citing to the Supreme Court's decision in *Escobedo v. Illinois*, 378 U.S. 478 (1964), stated:

> " 'We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the "confession" will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation. [*Escobedo*, 378 U.S. at 488-89]." *Connelly*, 479 U.S. at 181 (Brennan, J., dissenting).

Justice Brennan continued:

> "Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process. Triers of fact accord confessions such heavy weight in their determinations that 'the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained'. [Citations.] No other class of evidence is so profoundly prejudicial. [Citation.] 'Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof.' [citation]

Because the admission of a confession so strongly tips the balance against the defendant in the adversarial process, we must be especially careful about a confession's reliability." *Id* at 182.

¶ 126        It is also worth noting that beyond the violation of a defendant's constitutional right to due process, a coerced confession that is also false serves no one. It creates a false sense of retributive justice for the victim's family and a false sense of security for the community because the perpetrator is still at large. If that perpetrator is eventually found, the taxpayers become liable for reparations for the wrongful prosecution and imprisonment.[4] Nobody wins.

¶ 127        So, whether or not a confession is, in fact, freely given and reliable is critical.

¶ 128        As set out by our supreme court in *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996):

"Whether a statement is voluntarily given depends upon the totality of the circumstances. The question must be answered on the facts of each case; no single fact is dispositive. Factors to consider when determining voluntariness include: the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the

---

[4] According to a 2011 study done by the Better Government Association and the Center on Wrongful Convictions of Northwestern University School of Law, between 1989 and 2011, Illinois taxpayers incurred costs of $214,000,000 due to wrongful convictions occurring after 1976. John Conroy & Rob Warden, A Tale of Lives Lost, Tax Dollars Wasted and Justice Denied; http://www.bettergov.org/investigations/wrongful_convictions_1.aspx Of that amount $156,000,000 was actually paid as settlements and judgment to wrongfully convicted parties. Of the 85 wrongful convictions studied, 33 were attributable to false confessions. A 2013 update to the study showed an additional $39,000,000 in settlements and judgments has been paid, bringing the total of compensation to $195,000,000.

questioning; and any physical or mental abuse by police, including

the existence of threats or promises. [Citations.]"  Id. at 500-01.

Stated more generally, our test for assessing the voluntariness of a confession is "whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *Id.* at 500.

¶ 129       The portion quoted above (six minutes) is enough to establish that the confession was coerced/involuntary. The remainder of the interrogation, however, supports this conclusion.

¶ 130       There are four elements of the interrogation that support the finding of coercion.  Because the author has discussed the content of the DVD at length, my observations are noted only generically.  *First,* the detectives grossly and persistently overstate the strength of the evidence they claimed to have against Jackson.  They downplayed the ambivalence of Easton Eibeck's alleged identification of Jackson in the photo array and ignored Eibeck's insistence that he had run away before the shooter even drew the weapon from his pocket.  Both detectives drummed in that "everyone" put Jackson at the scene and he had been identified as the "trigger man."

¶ 131       *Second*, they kept pushing that this was justifiable self-defense—Harvey was a hateful and hated man and had attacked Jackson with a screwdriver.  Jackson needed to "minimize the damage," tell his own story; he needed to become a man.  They told him he dictates how much time he gets; their goal is to "see you walking on the street as a free man but only you can control that."  They suggest he will go free if he just tells all that happened.  They promise to tell the State's Attorney it was self-defense and Jackson is not a bad person.  They became his buddies.  Several times Curry squeezes Jackson's shoulder and pats his leg in seeming support.  Just tell us why you did it and then you can get on with your life.  While I acknowledge that officers are

41

allowed to lie during interrogations, these untruths, in combination with the other factors, support a find of coercion.

¶ 132    *Third*, they feed him all the facts of the shooting (except the type of gun, about which they give him a 50/50 choice – pistol or revolver?).  They do not, however, tell him the names of the other three alleged participants in the shooting, and, as part of his "confession," he insists he was the only person there, implicating no one else even though the detectives have assured him the others implicated him.  We can reasonably infer that he does not name them because he does not know who the participants were.

¶ 133    *Fourth*, there are the long periods of silence seen on the tape.  Jackson testified that he stopped talking because he was trying to exercise his right to remain silent.  But, although he asked to have his grandmother or his mother in the room with him, he never asked for a lawyer. The law is clear that "[o]nce the right to remain silent has been waived, it can be invoked only by a defendant's positive assertion that he wants to remain silent."  *People v. Patterson*, 217 Ill. 2d 407, 445 (2005).  It is not clear to me that the police have any obligation to advise a suspect, as part of the *Miranda* warning or otherwise, about how to invoke that right.  I do not, however, think it is sufficient to say, as Detective Curry said:

> "You've got the right to remain silent; anything you say can and
>
> will be used against you in a court of law; you've got the right to
>
> talk to a lawyer and have him present with you while you're being
>
> questioned; if you can't afford to hire a lawyer, one will be
>
> appointed to represent you before any question if you wish; *if you*
>
> *decide at any time to exercise these rights and not answer any*
>
> *questions or make any statements* [pause], *okay.*  Do you

> understand each of these rights as I've explained to you? [Jackson
>
> says, 'uh,huh'.] Having in mind these rights, do you wish to talk
>
> to me and Detective McDaniel right now? [Jackson says, 'well,
>
> yeah, I'd be willing to talk to you.']" (Emphasis added.)

The italicized language above seems to imply that silence is sufficient to exercise his right to remain silent. This clearly misguides Jackson as to the applicable law.

¶ 134    For all of these reasons, I believe the DVD in the record more than sufficiently demonstrates that Jackson's confession was coerced, involuntary, and unreliable.

¶ 135    JUSTICE HOLDRIDGE, dissenting.

¶ 136    I would find that the trial court correctly denied the defendant's pretrial motion to quash his arrest and suppress evidence. When reviewing a circuit court's ruling on a motion to suppress, mixed questions of law and fact are presented. *People v. Lee,* 214 Ill. 2d 476, 483 (2005). The circuit court's findings of fact are entitled to deference and these findings will be upheld on review unless the findings are against the manifest weight of the evidence. *People v. Hackett*, 2012 IL 111781 ¶ 18. While we review the ultimate question of whether evidence was properly suppressed, we must do so only after giving due deference to the factual conclusions of the trial court. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). My disagreement with the majority and the special concurrence is predicated on whether the trial court properly weighed the credibility of the eyewitness, Easton Eibeck. Detective Curry testified at the suppression hearing that Eibeck had provided key information that allowed Curry to identify the defendant as the person who shot the victim. The majority goes into great detail to show that Eibeck's identification of the defendant was subject to some credibility issues. The trial court likewise noted the inconsistencies in Eibeck's testimony but ultimately found that the evidence presented at the suppression hearing supported a finding that the defendant's confession was admissible. The court specifically found that Eibeck's

43

initial reluctance to cooperate followed by his willingness to cooperate "made sense" and was "believable." Unlike the majority, I would allow the trial court to make that credibility determination. If Eibeck's statements to Curry and testimony in the suppression hearing were credible, as I believe they were, then applying these factual findings allows us to conclude that the arrest was lawful. I would find, therefore, that the court properly denied the defendant's motion to suppress.

¶ 137        I also disagree with my colleagues over the relevance of the statements made by Detective McDaniel regarding his opinion of the defendant's chances of receiving a fair trial.

¶ 138        Finally, I would also find no error occurred during the closing argument. As I would find no error occurred, I would not address the issue under the plain-error doctrine. It is well-settled that the trial court may regulate the substance and style of closing argument and its rulings on these matters will not be overturned on appeal unless they constitute a clear abuse of discretion. *People v. Meeks*, 382 Ill. App. 3d 81, 84 (2008). The defendant maintains that the trial court erred in sustaining the prosecution's objection to the defense counsel's argument that his confession was "involuntary." Justice Wright would find this to be reversible under the plain-error doctrine. I disagree. While the court sustained an objection to referring to the defendant's confession as "not the product of free will" it nonetheless allowed counsel's other comments regarding the confession to remain for the jury to consider. Given the totality of the defense counsel's closing argument, it simply cannot be said that the trial court abused its discretion by not permitting the counsel to characterize the defendant's confession as involuntary. I would, thus, find no error.

¶ 139        For the foregoing reasons, I would affirm the trial court.